TOMIO B. NARITA (SBN 156576)
Tomio.Narita@wbd-us.com
LELA M. AMES (*pro hac vice*)
Lela.Ames@wbd-us.com
JASMINE G. CHALASHTORI (*pro hac vice*)
Jasmine.Chalashtori@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, CA 94111
Telephone: (415) 433-1900
Facsimile: (415) 433-5530

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RITA ADE, DARIUS HAMMONS, and JACQUELINE PAIGE individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VIKI, INC.,<br><br>Defendant. | Case No.: 3:23-cv-02161-RFL<br><br>**STATEMENT OF RECENT DECISIONS** |

As permitted by Civil Local Rule 7-3(d)(2), Defendant Viki, Inc.'s respectfully submits this Statement of Recent Decisions to provide notice of three recent decisions relevant to its Motion to Dismiss.  Attached as Exhibit A is a true and correct copy of *Kuzenski v. Uproxx LLC*, No. 223CV00945WLHAGR, 2023 WL 8251590 (C.D. Cal. Nov. 27, 2023).   Attached as Exhibit B is a true and correct copy of a *Edwards v. Learfield Commc'ns, LLC*, No. 1:23-CV-65-AW-MAF, 2023 WL 8544765 (N.D. Fla. Oct. 6, 2023).  Attached as Exhibit C is a true and correct copy of *Peterson v. Learfield Commc'ns, LLC*, No. 8:23-CV-146, 2023 WL 9106244 (D. Neb. Dec. 8, 2023).

DATED: February 12, 2024              WOMBLE BOND DICKINSON (US) LLP
                                      TOMIO B. NARITA
                                      LELA M. AMES
                                      JASMINE G. CHALASHTORI


                                   By:   /s/Tomio B. Narita
                                         Tomio B. Narita
                                         Attorneys for Defendant
                                         Viki, Inc.

# EXHIBIT A

2023 WL 8251590
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Franklin KUZENSKI, Plaintiff,

v.

UPROXX LLC, Defendant.

Case No. 2:23-cv-00945-WLH-AGR
|
Signed November 27, 2023

**Attorneys and Law Firms**

Arnold C. Wang, Michael Anthony Jenkins, Arias Sanguinetti Wang and Torrijos LLP, Los Angeles, CA, Lance T. Spitzig, Pro Hac Vice, Nicholas A. Coulson, Pro Hac Vice, Liddle Sheets Coulson PC, Detroit, MI, Mickel M. Arias, Arias Sanguinetti Wang and Torrijos LLP, Los Angeles, CA, for Plaintiff.

David A. Steinberg, Lucy H. Plovnick, Pro Hac Vice, Mitchell Silberberg and Knupp LLP, Washington, DC, Rebecca Benyamin, Bradley J. Mullins, Mitchell Silberberg and Knupp LLP, Los Angeles, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT [37]**

WESLEY L. HSU, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is Defendant Uproxx LLC's ("Defendant") Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") (the "Motion"), dated August 24, 2023, against Plaintiff Franklin Kuzenski ("Plaintiff"), on behalf of himself and all others similarly situated. (Mot. to Dismiss, Docket No. 37). On September 22, 2023, Plaintiff filed an Opposition brief (the "Opposition") to Defendant's Motion. (Opp'n, Docket No. 43). On October 6, 2023, Defendant subsequently filed a Reply brief (the "Reply"). (Reply, Docket No. 45). This matter is fully briefed.

On October 20, 2023, the Court held a hearing and heard oral arguments from all parties.

After considering the parties' arguments and submitted evidence, and for the reasons stated below, the Court

GRANTS Defendant's Motion without prejudice and with leave to amend. Plaintiff shall file an amended complaint consistent with this Order within 21 days of its issuance.

**I. BACKGROUND**

Defendant is a digital media company that develops, owns, and/or operates a news and culture website located at www.uproxx.com (the "Website"). (FAC, Docket No. 36 ¶ 12; *see also* Uproxx Editorial Guidelines, https://uproxx.com/uproxx-editorial-guidelines (last visited Oct. 18, 2023)). [1]

Defendant's Website contains news articles and video content. (Docket No. 36 ¶ 13). Plaintiff alleges that the Website is "significantly tailored to provide a wide array of prerecorded video content, which constitutes a significant component of Defendant's published media." (*Id.*; *see also* Opp'n, Docket No. 43 at 1). Users may subscribe to Defendant's Website by "using their Facebook or Twitter profile, or by creating a display name and providing their email address." [2] (Docket No. 36 ¶ 16). Among other things, subscribers receive benefits including a unique user profile with a custom avatar, the ability to interact and communicate with other subscribers, earn badges and rewards, and receive "recurring emails from Defendant with links to articles and videos published to the Website." [3] (*Id.* ¶¶ 21–22).

**\*2** Plaintiff is an individual who since September 2019 has been subscribed to Defendant's Website. (Docket No. 36 ¶¶ 6, 47). Plaintiff alleges that Defendant's Website contains a "code analytics tool" called "Facebook Pixel," which "tracks the actions of Website visitors (subscribers), such as the pages a visitor accesses and the content they view." (*Id.* ¶ 25). The purpose of this tool is to monetize Defendant's Website in order to "knowingly collect[ ] and disclose[ ] its subscribers' [personally identifiable information ("PII")] to Facebook, namely data that personally identifies subscribers and the videos they view." (*Id.* 25). Specifically, "[w]hen someone watches a video on Defendant's Website, the video name and the viewer's [Facebook ID ("FID")] are simultaneously sent to Facebook via Facebook Pixel." (*Id.* ¶ 26). Facebook Pixel captures the URL of the video and the user's FID and discloses "c_user" cookie information. (*Id.*). An example is provided below:

(*Id.* ¶ 29). Plaintiff alleges that after watching videos contained on Defendant's Website while being logged into his Facebook account on the same device and/or browser, Defendant disclosed his PII to Facebook including the URL of the video that he accessed and his FID. (*Id.* ¶¶ 30, 50). Plaintiff further alleges that he did not consent to the disclosure of his PII and was not given the opportunity to opt out from such disclosures. (*Id.* ¶ 54).

On February 8, 2023, Plaintiff brought this class action lawsuit, on behalf of himself and others similarly situated, alleging a single cause of action under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. (Compl., Docket No. 1). On August 10, 2023, Plaintiff filed its FAC, the operative complaint. (Docket No. 36). On August 24, 2023, Defendant filed the instant Motion. (Docket No. 37). Plaintiff filed its Opposition on September 22, 2023 (Docket No. 43), and Defendant subsequently filed its Reply on October 6, 2023. (Docket No. 45).

## II. LEGAL STANDARD

Under Fed. R. of Civ. P. 12(b)(6), a party may move to dismiss a cause of action for failure to state a claim upon which relief can be granted. A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). To fulfill this requirement, a complaint must meet the notice pleading standards of Rule 8(a). Fed. R. Civ. Proc. 8(a). That is, a complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Rule 8(a), however, "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence." *Twombly*, 550 U.S. at 545, 127 S.Ct. 1955. The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable

inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The court is not required to accept as true legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

**\*3** Pursuant to Fed. R. Civ. P. 15(a)(2), courts granting dismissal should freely give leave to amend "when justice so requires." Courts apply this policy with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *see also Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (holding that dismissal with leave to amend should be granted even if no request to amend was made). Courts consider four factors in determining whether to grant leave to amend: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party. *United States v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

## III. DISCUSSION

Congress enacted the VPPA in 1988 to prohibit a "video tape service provider" from "knowingly disclosing" PII about its "consumers." 18 U.S.C. § 2710(b). The purpose of the act was "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." S. Rep. 100-599 at 1 (1988); *see also Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (providing a historical overview of the statute and its purpose). The act accomplished this goal by "allow[ing] consumers to maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. 100-599 at 8. Thus, underlying the act is the principle "that protection is merited when the consumer lacks control over the dissemination of the information at issue." *Netflix*, 795 F.3d at 1065–66.

In order to bring a claim under the VPPA "a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was

not authorized by section 2710(b)(2)." *Id.* at 1066. Notably, the VPPA only applies to "consumers" as it is defined within the VPPA. *See* 18 U.S.C. § 2710(a)(1).

### A. **Subscriber Under VPPA**

As a threshold matter, Defendant argues that the VPPA does not apply to Plaintiff because Plaintiff is not a "consumer" as defined under the VPPA. (Docket No. 37 at 5–8). The VPPA defines "consumer," as "any renter, purchaser, or *subscriber* of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added). The VPPA, however, does not define "subscriber," and the Ninth Circuit is silent as to its meaning in this statute. Given the lack of controlling caselaw, the parties cite to a myriad of district court cases that support their competing interpretations of "subscriber." *Compare e.g. Carter v. Scripps Networks, LLC,* No. 22-cv-2031 (PKC), —— F.Supp.3d ——, 2023 WL 3061858 at *6–7 (S.D.N.Y. Apr. 24, 2023) (holding that plaintiffs' subscription to HGTV's newsletter did not enable the plaintiffs to sue regarding videos on the defendant's website where the complaint did not allege that the plaintiffs' "status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience.") *with Harris v. Pub. Broad. Serv.,* No. 1:22-cv-02456-MLB, —— F.Supp.3d ——, 2023 WL 2583118 (N.D. Ga. Mar. 20, 2023) (denying motion to dismiss in similar VPPA claim where plaintiff signed up for PBS.org account, which required her to provide her name, email address, zip code, IP address, and account cookies).

\*4 Absent controlling authority, several district courts in California have applied the Eleventh Circuit's definition of "subscription," which requires "some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." *Ellis v. Cartoon Network, Inc.,* 803 F.3d 1251, 1256 (11th Cir. 2015) (internal quotation marks omitted) (finding that a user who downloaded and used the Cartoon Network's free mobile application on their smartphone to view freely available content, without more, is not a "subscriber," and therefore not a "consumer," under the VPPA); *see also Perry v. Cable News Network, Inc.,* 854 F.3d 1336, 1342 (11th Cir. 2017) (relying on *Ellis* in finding that plaintiff who downloaded and used CNN's free mobile application lacked the relationship required to make him a subscriber under VPPA because he did not provide CNN any personal information, make payments through the application to CNN, or engage in any other commitment or relationship that would allow him to have access to exclusive or restricted content). The *Ellis* court enumerated a non-exhaustive list of

six factors, which if exist, are indicative of a "subscriber" relationship: "payment, registration, commitment, delivery, [expressed association,] and/or access to restricted content." *Id.* (citation omitted). [4] In that case, the court analyzed the six factors and concluded plaintiff was not a subscriber within the meaning of the VPPA because among other things, he had not created an account with the Cartoon Network, did not provide any personal information, make payments to the network, or otherwise make a commitment with the network that would have given him access to exclusive or restricted content. *Ellis,* 803 F.2d at 1257.

Notably, in addition to the *Ellis* factors, several courts have reasoned, based on the plain reading of the statute, that to be a "subscriber" the plaintiff must also allege the "existence of a factual nexus or relationship between the subscription provided by the defendant and the defendant's allegedly actionable video content." *Tawam v. Feld Ent. Inc.,* No. 23-CV-357-WQH-JLB, 2023 WL 5599007, at *5 (S.D. Cal. July 28, 2023) (finding that user who viewed two videos on website, which promoted monster truck events, and then subsequently signed up for mailing list were not "subscribers" under VPPA because of lack of nexus); *see also Hunthausen v. Spine Media, LLC,* No. 3:22-CV-1970-JES-DDL, 2023 WL 4307163, at *3 (S.D. Cal. June 21, 2023) ("In the statute's full context, a reasonable reader would understand the definition of "consumer" to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large"); *see also Jefferson v. Healthline Media, Inc.,* No. 3:22-cv-05059-JD, ——, F.Supp. 3d ——, 2023 WL 3668522, at *3 (N.D. Cal. May 24, 2023) (finding that the scope of "subscriber" is limited to subscribers of "goods or services" from a video tape service provider based on a plain reading of VPPA, and thus plaintiff's allegation that it was a subscriber to Healthline's website newsletter was not a "good[ ] or service[ ]").

Here, Plaintiff alleges that he became a "subscriber" as defined under the VPPA of Defendant's Website because he signed up for an account and received several benefits including a unique user profile with a custom avatar, the ability to interact and communicate with other subscribers, earn website specific badges and rewards, and receive "recurring emails from Defendant with links to articles and videos published to the Website." (*Id.* ¶¶ 21–22). Further, because Plaintiff was logged into his Facebook account on the same device/browser, every time Plaintiff accessed a video, the Website captured via Facebook Pixel, Plaintiff's URL and FID and transmitted it to Facebook. (*Id.* 26–33). The

**WESTLAW** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Court finds that these allegations are insufficient to allege that Plaintiff is a "subscriber" as defined under the VPPA.

**\*5** Under the *Ellis* factors, Plaintiff only satisfies at most two factors: registration and express association. Plaintiff does not allege that any of the other *Ellis* factors are present such as paying for his subscription or receiving access to exclusive video content as a result of the subscription. [5] More importantly, Plaintiff's FAC fails to allege a factual nexus or relationship between the subscription (i.e., Website benefits) and the Defendant's allegedly actionable video content. *See e.g., Gardener v. MeTV*, No. 22 CV 5963, 2023 WL 4365901, at \*4 (N.D. Ill. July 6, 2023) ("The Court does not agree, however, with Plaintiffs' argument that the allegations that [they] opened an account separate and apart from viewing video content on MeTV's website is sufficient to render them 'subscribers' under the Act."); *see also Carter*, ⸺ F.Supp.3d at ⸺, 2023 WL, at \*6 (stating that "a customer's non-video transactions play no part in a defendant's liability under the VPPA").

Plaintiff argues that he "is a subscriber to Defendant's entire website, of which a large focus is audio visual materials" and thus the benefits from his subscription (i.e. the social media functions) enhance and affect his viewing of video materials. (Docket No. 43 at 6). The Court finds this argument unavailing. Nowhere in the FAC does Plaintiff allege that becoming a subscriber is connected in any way to Defendant's video content. Rather, the facts alleged indicate that becoming a subscriber provides a user with social media type benefits, such as a user profile, avatars, and ability to communicate with other users—not access to videos. In fact, the word "video" does not appear anywhere in the subscriber benefits message cited by Plaintiff in his FAC. (*See* Docket No. 36 ¶ 21). While Plaintiff does allege that subscribers receive an e-mail containing links to videos, this alone is insufficient as

the videos are not alleged to be exclusive to subscribers and can be accessed by anyone visiting Defendant's Website. [6] *See e.g. Carter*, ⸺ F.Supp.3d at ⸺, 2023 WL, at \*6 ("the Complaint does not include facts that plausibly allege that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience."). Further, a link to a video from Defendant's Website does not create a subscription relationship because any user can access the video on the Website. Accordingly, the FAC does not plausibly allege a VPPA claim.

### B. **Elements of VPPA Claim**

**\*6** Defendant separately contends the FAC fails to sufficiently allege at least three of its required elements including that: (1) Defendant did not disclose Plaintiff's PII; (2) even if it did, Defendant did not do so knowingly; and (3) Defendant is not a "video service provider" as defined under the VPPA. (*Id.*) The Court declines to address these arguments. As discussed above, the issue of whether Plaintiff is a "consumer" under the VPPA is a threshold issue, and thus the matter must be dismissed if not adequately alleged.

### IV. CONCLUSION

As the FAC does not sufficiently allege that Plaintiff is a "consumer" as defined under the VPPA, the Court **GRANTS** Defendant's Motion without prejudice and with leave to amend. Plaintiff shall file an amended complaint consistent with this Order within 21 days of its issuance.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 8251590

## Footnotes

1    Both parties contend that the Court may consider the Website and its contents for this Motion because it is incorporated by reference in the FAC. Specifically, the FAC contains a link to the Website, refers to the Website extensively throughout, and describes several aspects of the Website. (See Docket No. 37 at n.3; see also Docket No. 43 at n.1). The Court agrees. The Court will take judicial notice of the Website for the limited purpose of acknowledging its existence and that its content is publicly available but will not take judicial notice of the truth of its content. See Spy Optic, Inc. v. Alibaba.Com, Inc., 163 F. Supp. 3d 755, 763 (C.D. Cal. 2015) (finding that a court "may take judicial notice of the fact that an internet article is available to the

public, but they may not take judicial notice of the truth of the matters asserted...."). The Court also takes into consideration, where relevant, that the Website may have looked different during the relevant time period.

2    The Court notes that Facebook and Twitter are now known as Meta and X, respectively. To avoid confusion, the Court will refer to the companies' former names, as they are named in the FAC.

3    Plaintiff contends that during the relevant time period, the Website invited users to "subscribe" or become "members," whereas now the Website invites users to become "followers." In the Courts view, this is a distinction without a difference.

4    The First Circuit in *Yershov v. Gannett Satellite Info. Network, Inc.,* 820 F.3d 482, 489 (1st Cir. 2016), is the only other circuit to define "subscriber" under the FPPA. In *Yershov*, the First Circuit found that a user of the *USA Today* mobile application was a "subscriber," within meaning of VPPA because while the user paid no money, access required the plaintiff to provide "personal information, such as [plaintiff's] Android ID and [ ] mobile device's GPS location at the time [plaintiff] viewed a video, [and] each linked to his viewing selections." While the First Circuit disagreed with the holding of *Ellis*, it acknowledged that a "subscription" involved a relationship between the parties that was "materially different from what would have been the case" had the plaintiff not subscribed. *Id.* This Court declines to follow *Yershov*, and instead follows the numerous district cases that elect to follow *Ellis.*

5    During oral arguments, Plaintiff's counsel argued that at least four of the *Ellis* factors were sufficiently alleged or can be reasonable inferred in the FAC. The Court disagrees. Although the Court has made several reasonable inferences, the FAC as drafted, requires the Court to make one inference too many to support Plaintiff's reading. Rather than relying on its reasonable inferences to satisfy the other *Ellis* factors, Plaintiff should simply add those allegations to its amended complaint. For example, Plaintiff argues that he provided his personal information including his e-mail address to Defendant. This claim is not directly contained in the FAC. Instead, the FAC alleges generally that a user may subscribe by using either a social media account through Facebook or Twitter, or in the alternative, may use a display name and provide an e-mail. The FAC then contains several e-mails from Defendant related to the subscription process. The FAC does not allege that Plaintiff provided Defendant an e-mail address, a username, or any other personal information. The Court is left to guess and assume these facts. Plaintiff's counsel argued that the Court could reasonably infer based on the e-mails affixed to its submissions that Plaintiff must have provided an e-mail address to receive such e-mails. The Court declines to do so.

6    Plaintiff argues in its Opposition that the subscription provided exclusive access to certain videos. (Docket No. 43 at 7, n.2). The Court disregards this argument, however, because this claim is not contained in Plaintiff's FAC. Further, the Court is not creating a bright-line, categorical rule requiring that a subscription must provide access to exclusive video content not otherwise available to viewers without a subscription. This is just one factor that the Court considers in addition to the *Ellis* factors, and it is not dispositive or outcome determinative on its own.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2023 WL 8544765
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Gainesville Division.

Audra EDWARDS, Derek Edwards, and
Brian Stonebaker, on behalf of themselves
and all others similarly situated, Plaintiffs,
v.

LEARFIELD COMMUNICATIONS, LLC,
Sidearm Sports, LLC, et al., Defendants.

Case No. 1:23-cv-65-AW-MAF
|
Signed October 6, 2023

**Synopsis**

**Background:** Public university athletic team fans brought putative class action against university, athletic association, and teams' website's developers, alleging that website sent their personal information to third parties in violation of the Video Privacy Protection Act (VPPA). Defendants moved to dismiss.

**Holdings:** The District Court, Allen C. Winsor, J., held that:

users improperly named university as a party;

athletic association was an arm of the state entitled to Eleventh Amendment immunity;

developers were not arms of the state entitled to Eleventh Amendment immunity;

university was not an indispensable party;

fans were not consumers within meaning of VPPA; and

fans did not plausibly allege that website disclosed any of their own personally identifiable information.

Motions granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Subject Matter Jurisdiction.

**Attorneys and Law Firms**

Courtney E. MacCarone, Gary Suzutaro Ishimoto, Mark Samuel Reich, Levi & Korsinsky LLP, New York, NY, Jonathan Matthew Stein, Stein Law Florida PLLC, Boca Raton, FL, for Plaintiffs Audra Edwards, Brian Stonebraker.

Jonathan Matthew Stein, Stein Law Florida PLLC, Boca Raton, FL, for Plaintiff Vickie Herrington.

Bonnie DelGobbo, Baker & Hostetler LLP, Chicago, IL, Joel C. Griswold, Baker & Hostetler LLP, Orlando, FL, for Defendants Sidearm Sports LLC, Learfield Communications LLC.

## ORDER GRANTING MOTIONS TO DISMISS

Allen Winsor, United States District Judge

**\*1** Working with the University of Florida's Athletic Association, Learfield Communications and Sidearm Sports developed the official website for everything Gators athletics. Fans can use the website—floridagators.com—to buy tickets, shop for gear, or watch videos with player interviews, sports highlights, and the like. Plaintiffs Audra Edwards, Derek Edwards, and Brian Stonebaker signed up for the website's free email newsletter. But they claim they got more than they signed up for: they allege that when they click links in the newsletter, the website sends their personal information to third parties.

Plaintiffs sued the University of Florida, The University Athletic Association, Learfield, and Sidearm under the Video Privacy Protection Act, 18 U.S.C. § 2710. That law generally precludes video providers from knowingly disclosing personally identifiable information about a consumer's video-watching habits. *Id.* Plaintiffs seek damages and injunctive relief. ECF No. 4 (First Amended Complaint (FAC)).

The UAA and UF Board of Trustees (Plaintiffs did not name the Board as a defendant) moved to dismiss based on Eleventh Amendment immunity and failure to state a claim. ECF No. 22. Learfield and Sidearm moved to dismiss on similar grounds and also advanced an indispensable-party argument. ECF No. 24. (For simplicity, this order refers to Learfield and Sidearm collectively as "Learfield," *see id.* at 8.[1]) Plaintiffs responded to both motions, ECF Nos. 32, 41, and the parties

filed several notices of supplemental authority and responses. ECF Nos. 29-31, 35, 37, 39-46.

The UAA and Trustees requested oral argument. ECF No. 22 at 34. Plaintiffs and Learfield did not. In my discretion, I conclude that oral argument is unnecessary. Having considered the parties' written arguments, I now grant both motions.

## I.

Learfield is a marketing company that creates and manages websites for college athletic programs.[2] FAC ¶¶ 33-44. It manages floridagators.com, the website for Florida Gators athletics, *id.* ¶ 54, which I will call the "Gators Website."

As noted above, fans can visit the Gators Website to watch free video content. They can also sign up for free "Florida Gator Email Updates." https://www.floridagators.com/sports/2015/12/10/_updates_.aspx (last accessed October 5, 2023). Clicking "Subscribe Now" directs visitors to the "Email Signup" page. *Id.*; FAC ¶ 101. That page asks for a fan's name, email address, zip code, and the type of content sought. FAC ¶ 101; https://www.floridagators.com/sports/2017/8/15/email-signup.aspx?id=13853 (last accessed October 5, 2023). Those who sign up receive emails that "include links to the Team Website, which contains [the] articles and videos." FAC ¶ 3.

**\*2** Learfield installed Facebook's "Pixel" software on the Gators Website. *Id.* ¶¶ 55-58; 80-94. The pixel enables Facebook to track its users' activity on other websites. *Id.* When a user logs into Facebook, Facebook generates a "c_user" cookie and stores it on the user's device. *Id.* ¶ 78. That cookie "contains a user's non-encrypted Facebook User ID number ('UID')." *Id.*[3] Then, if that user interacts with the Gators Website, the site sends Facebook metadata that "may" include a video title and a c_user cookie if one is in place on the user's device. *Id.* ¶¶ 82-92. If someone can access the metadata and find the c_user ID, he can append the c_user ID to a URL (www.facebook.com/[UID here]) to reach the corresponding Facebook profile. *Id.* ¶ 79.

Plaintiffs are Facebook users who signed up for the Gators Website's email updates. *Id.* ¶¶ 15-17. After receiving email updates, they all used devices logged into Facebook to watch videos on the website. *Id.* ¶¶ 15-17. And they never gave

written consent to having any video-watching data shared with Facebook. *Id.* ¶¶ 98-101.

## II.

Turning now to Defendants' arguments, I note at the outset that Plaintiffs improperly named UF as a defendant. Pursuant to state law, UF itself lacks the capacity to be sued. *See* Fed. R. Civ. P. 17(b); Fla. Stat. § 1001.72(1); *see also Paylan v. Teitelbaum*, 2017 WL 2294084, at *2 (N.D. Fla. May 23, 2017) ("[UF's Board of Trustees] is the proper entity to be sued in cases against the University of Florida."), *report and recommendation adopted*, 2017 WL 2294083 (N.D. Fla. May 25, 2017). (The motion to dismiss presented this argument, ECF No. 22 at 1 n.1, and Plaintiffs offered nothing in response.) I will dismiss the claims against UF itself on this basis. But I would dismiss those claims anyway because UF is entitled to Eleventh Amendment immunity for the same reasons UAA is. I address those reasons next.

## A.

"The law is well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an arm of the state is sued." *Myrick v. Fulton Cnty., Georgia*, 69 F.4th 1277, 1294 (11th Cir. 2023) (cleaned up) (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc)). "An assertion of Eleventh Amendment immunity essentially challenges a court's subject matter jurisdiction." *Id.* (quoting *Seaborn v. Fla. Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998)). This issue is therefore a logical starting point.

### i. The UAA is entitled to Eleventh Amendment immunity.

UAA claims it is an arm of the state, ECF No. 22 at 6-13, 15-18, and Plaintiffs do not meaningfully argue otherwise. Indeed, Plaintiffs essentially concede the Eleventh Amendment's general applicability, proceeding directly to their argument that the *Ex parte Young* exception applies. *See* ECF No. 32 at 28-35. Nonetheless, I will briefly analyze the arm-of-the-state issue.

To determine whether an entity is an arm of the state, a court must first consider "the particular function in which [it] was engaged" during its challenged conduct. *Lake v. Skelton*,

840 F.3d 1334, 1337-38 (11th Cir. 2016) (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc)). It then determines whether the defendant acted as an arm of the state in performing that function. *Id.* Four factors guide that inquiry: (1) how state law defines the entity, (2) the state's degree of control over it, (3) the source of its funding, and (4) the party responsible for judgments against UAA. *See id.* (citing *Manders*).

 **\*3** Applying these factors, I conclude the UAA is an arm of the state. [4] As the UAA points out, Florida law defines it as a direct support organization (DSO). ECF No. 22 at 8-10. DSOs like UAA are not "autonomous and self-sufficient entit[ies]" but instead operate under "substantial state 'constraints over ... day-to-day operations." *Plancher v. UCF Athletics Ass'n, Inc.*, 175 So. 3d 724, 729 (Fla. 2015) (citations omitted) (reasoning that UCF's athletic association, materially identical to the UAA here, had sovereign immunity); *see also* Fla. Admin. Code R. 6C1-1.300 (providing that UAA employees are also considered employed by UF's Board of Trustees, that UAA must submit a budget to UF's president, that UAA must report any significant changes in spending to the president, and that the president can decertify UAA as a DSO if it stops "serving the best interest of the University").

As an arm of the state, UAA is entitled to Eleventh Amendment immunity. Plaintiffs do not argue that Congress has abrogated the UAA's immunity or that Florida has waived it. [5] *See* ECF No. 32 at 28-35. Instead, Plaintiffs argue that they can seek injunctive relief against the UAA under *Ex parte Young*. *Id.* But that exception applies only when plaintiffs seek injunctive relief against state *officers*. *Ex Parte Young*, 209 U.S. 123, 168, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Ex parte Young*'s narrow exception to immunity "has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *P. R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (citation omitted).

### ii. Learfield has not shown it is entitled to Eleventh Amendment immunity.

Learfield also invokes Eleventh Amendment immunity, ECF No. 24 at 11-14, but unlike the UAA, they have not shown entitlement to immunity—at least not at this stage. They base their argument on Fla. Stat. § 768.28(9)(a), which provides state law immunity to state agents and employees:

> An officer, employee, or agent of the state or of any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

In Learfield's view, they are the UAA's agent and thus enjoy the same immunity. But § 768.28(9)(a) cannot immunize defendants from liability *under federal law*. *See Howlett By & Through Howlett v. Rose*, 496 U.S. 356, 375, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) ("The elements of, and the defenses to, a federal cause of action are defined by federal law." (citing cases in accord)); *see also Hufford v. Rodgers*, 912 F.2d 1338, 1341 n.1 (11th Cir. 1990) ("[W]hen parties raise federal claims (at least, under Section 1983), then federal law must determine whether particular governmental entities are subject to suit" (citing *Howlett*, 496 U.S. at 377, 110 S.Ct. 2430)).

 **\*4** Thus, Learfield's entitlement to Eleventh Amendment immunity turns on the same four-factor analysis applicable to the UAA. *See Lake v. Skelton*, 840 F.3d 1334, 1337-38 (11th Cir. 2016) (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc)). And Learfield has not shown at this stage that it is immune from a VPPA claim.

To the extent Learfield contends § 768.28(9)(a) shows that an agent is an arm of the state, it is unlikely that corporations would even qualify as agents under the statute. *See Lovelace v. G4S Secure Sols. (USA), Inc.*, 320 So. 3d 178, 189-90 (Fla. 4th DCA 2021) (suggesting that § 768.28(9)(a)'s application is limited to individuals, not corporations: "subsection (9) states that those individuals may not be 'personally liable.' .... The United States Supreme Court has found that the ordinary usage of the word 'personal' refers to individuals, not corporations."). But more importantly, the degree of control the state retained here is minimal. The complaint alleges that Learfield managed the website and mobile platforms,

providing set up and operation services, data storage, video-hosting, and technical backend and support services. These allegations—which I must accept as true at this stage—show Learfield retained significant control. FAC ¶¶ 45-46, 49-54.

While Learfield says that any damages award against them would require "money to be paid jointly by the state and Learfield," it does not explain why that would be. ECF No. 24 at 13-14. And Learfield makes no argument as to the third factor of the analysis, source of funding. In short, Learfield has not shown entitlement to Eleventh Amendment immunity.

## B.

Learfield next argues that the UF Defendants are indispensable parties that cannot be joined and that I therefore must dismiss. ECF No. 24 at 14-17. Rule 12(b)(7) allows dismissal for failure to join a required party under Rule 19. Rule 19 mandates joinder of required parties and, if a required party is absent, "the court must determine whether the lawsuit can proceed without the party 'in equity and good conscience.' " *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1347 (11th Cir. 2011) (quoting Fed. R. Civ. P. 19(b)). The party asserting mandatory joinder bears the burden of showing it. *Id.* (citing *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003)).

Learfield offers two reasons why the UF Defendants are indispensable, but neither is persuasive. Learfield first argues that the UF defendants are necessary "because Plaintiffs' claims concern allegedly concerted conduct" by all Defendants—thus inhibiting the court from "accord[ing] complete relief" and subjecting Learfield to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." *See* ECF No. 24 at 15; Fed. R. Civ. P. 19(a)(1) (A)(i); *id.* (a)(1)(B)(ii). But that will not work. "It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990).

Learfield next argues that allowing the action to proceed without the UF Defendants risks impairing their interests in the website. *Id.* at 15-16, 111 S.Ct. 315. That is not persuasive either. Plaintiffs challenge the Gators Website's use of Facebook's pixel. Learfield does not explain how or why UF has an interest in the continued use of pixel, or any interest in the data it collects. Nor does Learfield explain

how a judgment against it would undermine UF's interest in anything. This is unlike the cases Learfield cites, in which the property of a nonparty could be impacted. *See Lee v. Anthony Lawrence Collection, LLC*, 47 F.4th 262, 269 (5th Cir. 2022), cert. denied, ––– U.S. ––––, 143 S. Ct. 1054, 215 L.Ed.2d 279 (2023) (involving another party's "battle of ownership" of a trademark); *Fla. Wildlife Fed'n Inc. v. United States Army Corps of Engineers*, 859 F.3d 1306, 1309 (11th Cir. 2017) (involving another party's right to control "the waters at the center of th[e] controversy"). UF does not purport to have ownership interest or control over the pixel or the data it collects.

**\*5** In short, Learfield has not shown that the court should dismiss based on the unavailability of any indispensable party.

## C.

At last, the merits. Learfield argues that Plaintiffs have failed to state a claim upon which relief can be granted. ECF No. 24 at 17. To survive this challenge, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Threadbare conclusory statements are insufficient. *Id.* at 678-79, 129 S.Ct. 1937. A claim is facially plausible if, construing the facts in the light most favorable to plaintiffs, the facts allow a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

Learfield argues that Plaintiffs' claims fail because (1) Plaintiffs are not "consumer[s]" protected by the VPPA, (2) Learfield and Sidearm are not "video tape service provider[s]," and (3) Plaintiffs do not allege a knowing disclosure of "personally identifiable information." *See* ECF No. 24 at 2. Learfield separately argues that the VPPA unconstitutionally restricts free speech. *Id.* at 29-36.

Learfield is correct that the complaint fails to state a VPPA claim for reasons (1) and (3). I am skeptical of Learfield's argument as to (2), but I need not resolve the issue. [6] And I likewise do not reach the constitutional arguments. *Cf. Camreta v. Greene*, 563 U.S. 692, 705, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (noting a "longstanding principle of judicial restraint requires that courts avoid reaching

constitutional questions in advance of the necessity of deciding them") (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)).

#### i. Plaintiffs have not alleged that they are consumers.

The VPPA prohibits "video tape service provider[s]" from knowingly disclosing "personally identifiable information concerning any consumer" to third parties, subject to certain exceptions. 18 U.S.C. § 2710(b). As relevant here, the law defines "consumer" as "any renter, purchaser or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). Because the email updates are free, Plaintiffs are not renters or purchasers. Indeed, they do not claim otherwise, arguing only that they are "subscriber[s]" to the Gators Website's email updates. FAC ¶¶ 15-17; ECF No. 41 at 16-22.

The VPPA does not define "subscriber." The Eleventh Circuit interpreted "subscription" in *Ellis v. Cartoon Network, Inc.* to "involve[ ] some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." 803 F.3d 1251, 1256 (11th Cir. 2015). Factors that may show a subscription include "payment, registration, commitment, delivery, expressed association, and[ ] access to restricted content." *Id.* (cleaned up) (quoting *Yershov v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135, 147 (D. Mass. 2015), *rev'd*, 820 F.3d 482 (1st Cir. 2016)); *see also Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015) ("Whatever the nature of the specific exchange, what remains is the subscriber's deliberate and durable affiliation with the provider ....."); *Ellis*, 803 F.3d at 1257-58 ("agree[ing] with the approach and result of *Austin-Spearman*").

**\*6** Applying this framework in *Ellis*, the Eleventh Circuit held that "downloading an app for free and using it to view [video] content at no cost is not enough to make a user of the app a 'subscriber.' " 803 F.3d at 1257. It emphasized that the act involved no durable commitment at all; the "user [was] free to delete the app without consequences whenever he like[d], and never access its content again." *Id.* That made downloading the app "the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content." *Id.*; *see also Perry v. Cable News Network*, 854 F.3d 1336, 1341-44 (11th Cir.

2017) (affirming dismissal of an identical claim for the same reasons).

Just as downloading a free app did not create a subscription in *Ellis* and *Perry*, Plaintiffs' signing up for email updates here did not make them "subscribers." Signing up requires no "durable" commitment or real exchange at all. *Austin-Spearman*, 98 F. Supp. 3d at 669. Plaintiffs do not allege that signing up to "establish[es] an account [on]" floridagators.com. *Ellis*, 803 F.3d at 1257; *see also Perry*, 854 F.3d at 1342 (quoting *Ellis*). And although the fact that the emails were free is not a dispositive factor, it is still a factor. *Ellis*, 803 F.3d at 1256; *Perry*, 854 F.3d at 1342. Here, it further supports the conclusion that Plaintiffs can opt out or ignore the newsletter "without consequences whenever [they] like, and never access its content again." *Ellis*, 803 F.3d at 1257.

Significantly, Plaintiffs do not allege that those who sign up for the emails get any real benefit in exchange. Signing up does not grant access to any exclusive or restricted content, much less any exclusive video content. *Cf. Ellis*, 803 F.3d at 1257; *Perry*, 854 F.3d at 1342; *see also* ECF No. 41. The newsletters linked to videos on the Gators Website itself, where Plaintiffs watched them. FAC ¶¶ 3, 15-17. Anyone can watch from the Gators Website, regardless of whether they signed up for the newsletter. That makes the newsletter "the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the [Gators] website's content." *Ellis*, 803 F.3d at 1256. In other words, based on the facts Plaintiffs have alleged, the newsletter simply notifies readers about Gators Website content—content available to anyone. [7]

It is true that Plaintiffs conveyed minimal personal information—their name, email, and zip code—in signing up for the emails. *Ellis*, 803 F.3d at 1256. But that is only one factor suggesting a subscription may exist. *Id.* (reasoning subscriptions "involve some or [most] of the ... factors" (first alteration in original, quoting *Yershov*, 104 F. Supp. 3d at 147)). And considering this in context of the other factors—the newsletters are free, are cancellable without consequences, and provide no exclusive benefits—one cannot conclude it plausible that Plaintiffs are "subscribers" for VPPA purposes. *See Gardener v. MeTV*, — F.Supp.3d —, —, 2023 WL 4365901, at \*5 (N.D. Ill. July 6, 2023) (reasoning that "only one factor [wa]s met ...: registration," where plaintiff used name and email to sign up for newsletter, but "this one factor alone seem[ed] insufficient"); *Carter v. Scripps Networks, LLC*, — F. Supp. 3d —, —,

2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023) ("The newsletters may entice or encourage recipients to view hgtv.com videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers."); *Salazar v. Nat'l Basketball Ass'n*, ––– F. Supp. 3d ––––, ––––, 2023 WL 5016968, at *9-10 (S.D.N.Y. Aug. 7, 2023) (similar); *Alex v. NFL Enters. LLC, et al.*, 2023 WL 6294260 (S.D.N.Y. Sep. 27, 2023) (similar); *cf. Austin-Spearman*, 98 F. Supp.3d at 671-72 (granting leave to amend to add details about a newsletter, but "do[ing] so with great reluctance" and "remain[ing] skeptical" that the amendment would state a claim).

**\*7** Because Plaintiffs have not alleged facts plausibly showing they are "consumers," under the VPPA, their claim must be dismissed.

### ii. Plaintiffs do not allege the Gators Website discloses "personally identifiable information."

The VPPA claim fails for a separate, independent reason: Plaintiffs have not alleged any disclosure of personally identifiable information.[8] As already noted, the VPPA only prohibits disclosing "personally identifiable information" (PII). 18 U.S.C. § 2710(b)(1). That term "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3).

No binding authority interprets that definition. The First Circuit has held PII must be "reasonably and foreseeably likely to reveal which ... videos [a specific person] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). It cautioned that, at some point, "the linkage of information to identity [can] become[ ] too uncertain, ... too dependent on too much yet-to-be-done, or unforeseeable detective work" to allow a plausible VPPA claim. *Id.* at 486. The Third and Ninth Circuits have adopted a narrower test, asking whether the information at issue "would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3d Cir. 2016); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017); *see also In re Nickelodeon*, 827 F.3d at 284 (citing Congress's "quite narrow" purpose in enacting the VPPA—preventing disclosures that would identify the recipient to identify a person's video-watching habits "with little or no extra effort").

Plaintiffs' claim would fail under either test. And under any reasonable interpretation of the statute, Plaintiffs have not alleged enough. At best, they plausibly allege that *sometimes* Facebook can use a UID to identify a particular person. They do not allege that Facebook ever used, or even can use, *their* UIDs to identify *them* or *their* video-watching habits. The complaint does not even allege that each Plaintiff was signed into his or her own Facebook account when visiting the Gators Website; it says only that each Plaintiff "us[ed] a device that was signed into Facebook." FAC ¶¶ 15-17.

Even assuming Plaintiffs were signed into their own Facebook accounts, the complaint "contains no allegation as to what information was actually included on [their] profile[s]," such as their names or birthdays. *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 92 (S.D.N.Y. 2022). It offers only threadbare recitals that Ms. Edwards's and Mr. Stonebaker's "profile[s] included personally identifiable information." FAC ¶¶ 15, 17 (The complaint omits even any threadbare recital as to Mr. Edwards, *id.* ¶ 16.). That "formulaic recitation of the element[ ]" is not enough. *Iqbal*, 556 U.S. at 681, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

**\*8** Perhaps more significantly, the complaint does not allege facts plausibly showing that the Gators Website's pixel "readily permit[s] *an ordinary person* to identify" Plaintiffs' video-watching behavior, *In re Nickelodeon*, 827 F.3d at 267 (emphasis added), or how Facebook can do that without "unforeseeable detective work," *Yershov*, 820 F.3d at 486. Although Plaintiffs do allege that the Gators Website transmits metadata, which contains c_user IDs and "may" contain video titles, FAC ¶¶ 82-92, they offer no facts explaining how Facebook accesses that metadata, why doing so does not require technical expertise, or how much metadata Facebook has to comb through to discover someone's c_user ID and the video titles. The complaint only alleges in conclusory fashion that "[o]nce the Pixel's routine exchange of information is complete, the UID becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user." *Id.* ¶ 79.

\* \* \*

To summarize, the complaint does not plausibly allege that Plaintiffs are "consumer[s]" under the VPPA or that the Gators Website has disclosed (or will disclose) any of their own PII to any third party. For each of those independent

reasons, Plaintiff's First Amended Complaint fails to state a VPPA claim.

Although it appears unlikely that Plaintiffs will be able to add additional facts that state a plausible VPPA claim, *see Austin-Spearman*, 98 F. Supp. 3d at 671-72, the dismissal will be with leave to amend.

## CONCLUSION

Defendants' motions to dismiss (ECF Nos. 22, 24) are GRANTED. The first amended complaint (ECF No. 4) is DISMISSED. UF is dismissed from this action as an improperly named party, and Plaintiffs' claim against the UAA is dismissed without prejudice based on Eleventh Amendment immunity.

Plaintiffs' VPPA claim against Learfield and Sidearm is dismissed for failure to state a claim. Plaintiffs may file an amended complaint within 14 days to plead additional facts supporting their claim.

If they do not timely amend, final judgment will enter dismissing the VPPA claim against Learfield and Sidearm with prejudice. Judgment will enter as to UF and the UAA after a final resolution of Plaintiffs' claim against Learfield and Sidearm.

SO ORDERED on October 6, 2023.

**All Citations**

--- F.Supp.3d ----, 2023 WL 8544765

## Footnotes

1    All page citations are to the CM/ECF generated numbers.

2    The facts come mostly come from the complaint, and at this stage I must accept them as true. *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1238 (11th Cir. 2023). But I note that the complaint cites many websites, including the Gators Website itself. Because these webpages are "referred to in the complaint, central to the plaintiff's claim[s], and of undisputed authenticity," I may also consider them without converting Defendants' motions into summary-judgment motions. *See Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020)).

3    According to a Facebook page cited in the First Amended Complaint (ECF No. 4 at 27 n.48), "[c]ookies are small pieces of text used to store information on web browsers. Cookies are used to store and receive identifiers and other information on computers, phones and other devices." https://www.facebook.com/policy/cookies/ (last visited October 5, 2023).

4    UAA cited evidence supporting each factor, including UAA bylaws, articles of incorporation, and financial information. Plaintiffs have not objected to my consideration of that evidence, offered no contradictory evidence, and did not request an evidentiary hearing. Indeed, their response did not even dispute the legal conclusion that UAA is an arm of the state. At any rate, I may consider the evidence to determine sovereign immunity. *See Papasan v. Allain*, 478 U.S. 265, 302 n.1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (considering matters outside the complaint in addressing the Eleventh Amendment on a motion to dismiss when the facts were not disputed).

5    These would be difficult arguments. Nothing in the VPPA shows an "unmistakably clear" congressional intent to abrogate. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 387, 143 S. Ct. 1689, 1695, 216 L.Ed.2d 342 (2023) (quoting *Fin. Oversight & Mgmt. Bd. for P.R. v. Centro De Periodismo Investigativo, Inc.*, 598 U.S. 339, 346, 143 S. Ct. 1176, 1183, 215 L.Ed.2d 321 (2023)). And Florida Statute § 768.28—which waives Florida's sovereign immunity in limited instances—does not waive Eleventh Amendment immunity here. *See Fla. Stat. § 768.28(18)*.

6    "[V]ideo tape service provider[s]" are persons "engaged in the business ... of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Plaintiffs' allegations appear to support the conclusion that Learfield is engaged in the business of delivering audio visual materials through its websites. *See* FAC ¶¶ 18-19, 36-44, 47.

7    Learfield also argues that Plaintiffs are not "subscriber[s] of goods or services" because "goods or services" only encompasses *audio-visual* goods or services, not emailed newsletters. ECF No. 24 at 19-20. That is perhaps correct, but I do not decide the issue. Either way, though, the newsletter does not grant access to exclusive video content, and that is a relevant factor. *See Ellis*, 803 F.3d at 1257; *Perry*, 854 F.3d at 1342.

8    I reach this conclusion without resolving Learfield's arguments that Plaintiffs' own browsers disclosed their data and that Plaintiffs do not plausibly allege knowledge. *See* ECF No. 24 at 26-29.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT C

2023 WL 9106244
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

Tim PETERSON, on Behalf of Himself
and All Others Similarly Situated, Plaintiff,

v.

LEARFIELD COMMUNICATIONS,
LLC, Sidearm Sports, LLC, Defendants.

NO. 8:23-CV-146
|
Signed December 8, 2023

**Attorneys and Law Firms**

Courtney E. MacCarone, Pro Hac Vice, Gary S. Ishimoto, Pro Hac Vice, Mark S. Reich, Pro Hac Vice, Levi, Korsinsky, LLP Law Firm, New York, NY, Pamela A. Car, William L. Reinbrecht, Car, Reinbrecht Law Firm, Omaha, NE, for Plaintiff.

Bonnie L. DelGobbo, Pro Hac Vice, Baker, Hostetler Law Firm, Chicago, IL, Jarrod D. Reece, Likes, Meyerson Law Firm, Omaha, NE, for Defendants.

**MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS**

Brian C. Buescher, United States District Judge

**\*1** Plaintiff Tim Peterson has brought a class action suit on behalf of subscribers to huskers.com (the Team Website), a website alleged operated by defendants Learfield Communications, LLC, and Sidearm Sports, LLC (collectively, Defendants or Learfield [1]) for the University of Nebraska-Lincoln (UNL) athletic department. [2] Filing 1. Plaintiff's suit contains a single claim: a violation of the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710, et seq. Filing 1 at 31–35. Defendants have moved to dismiss the Complaint pursuant to of the Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7) for lack of subject matter jurisdiction, failure to state a claim, and failure to join a necessary party, respectively. For the reasons stated here, the Court grants Defendants' Motion.

# I. INTRODUCTION

## A. Background of the Video Privacy Protection Act

"The impetus for [the VPPA] occurred when a weekly newspaper in Washington published a profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store" while "the Senate Judiciary Committee was holding hearings on Judge Bork's nomination to the Supreme Court." S. Rep. 100-599, at *5 (1988). [3] The Senate Report for the VPPA stated that its purpose is "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id.*, at *1. As explained by the Third Circuit Court of Appeals, "[t]he Act creates a private cause of action for plaintiffs to sue persons who disclose information about their video-watching habits." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278 (3d Cir. 2016). The VPPA statute provides, "A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1). Subsection (d) provides relief in the form of "actual damages but not less than liquidated damages in an amount of $2,500," as well as punitive damages and attorneys' fees. *Id.* § 2710(d). The Court will discuss the VPPA in greater detail in the Analysis section.

## B. Factual Background

The Court notes at the outset that the Complaint contains detailed factual allegations of a technical nature which Plaintiff at times depicts through images. *See, e.g.*, Filing 1 at 23–25. Fortunately, an elaborate discussion of the technical aspects of this case is unnecessary because the Court ultimately grants Defendants' Motion to Dismiss on more familiar grounds: statutory interpretation. Nevertheless, the Complaint contains numerous factual allegations, which the Court details below. The Court considers the following nonconclusory allegations as true for the purposes of ruling on this motion. *See Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (quoting *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021)).

### 1. The Parties

**\*2** Plaintiff Tim Peterson is a Colorado resident who allegedly subscribed to Nebraska Cornhuskers' newsletters in or around 2016. Filing 1 at 4 (¶ 15). Plaintiff alleges that he never agreed to have his "personal identifying information" (PII) shared with Facebook when he subscribed to the newsletters. Filing 1 at 4 (¶ 15). Nonetheless, three or four times per month, Plaintiff allegedly "watched pre-recorded video content on the Team Website using a device that was signed into Facebook, as recently as December 2022, resulting [in his] PII and Video Watching Data being shared with Facebook." Filing 1 at 4 (¶ 15). Plaintiff avers that he "would continue or resume using the site should the offending tracking tools be removed or rendered inactive." Filing 1 at 4 (¶ 15). Plaintiff brings this suit on behalf of himself and on behalf of a class of similarly situated persons pursuant to [Federal Rule of Civil Procedure 23.](#) Filing 1 at 3 (¶ 13).

Defendant Learfield is an LLC formed in Delaware with its headquarters in Texas. Filing 1 at 3 (¶ 16). Defendant Sidearm Sports is an LLC formed in Missouri with its headquarters in New York. Filing 1 at 4 (¶ 17). Learfield purchased Sidearm Sports in 2014." Filing 1 at 5 (¶ 17). Plaintiff alleges that collectively, Defendants "run[ ] and operate[ ] the websites of 1,100 college and universities, including 300 of the 320 schools in Division 1 Sports." Filing 1 at 10 (¶ 34). Plaintiff avers that Defendants' "single most opted in product" is a "streaming platform [that] deploys an original solution where fans [are] able to find live, original and pre-recorded content all in one central location." Filing 1 at 10 (¶ 37) (alterations in original).

*2. The Team Website and Newsletters*
Plaintiff alleges that Defendants Learfield and Sidearm Sports operate huskers.com (the Team Website), which "provides users with access to video content related to the university's athletics, including pre-recorded clips of games, interviews with players and team staff, sports analysts, and more." Filing 1 at 1–2 (¶¶ 1–2). Plaintiff describes Defendants' alleged "complete control of the Team Website," as follows:

> Operator Defendants have the ability to lock the client out of the Team Website; Operator Defendants derive revenue from the Team Website through revenue sharing with advertisers; Operator Defendants reserve their own advertising space

on the Team Websites; and Operator Defendants set and implement [their] own code for generating and tracking advertising on the website, user tracking, video hosting, subscription services, and website design.

Filing 1 at 14 (¶ 52). Plaintiff alleges, "The Team Website does not seek nor obtain permission from their subscribers, including Plaintiff and the Class, to share the subscribers' PII or Video Watching Data with third-parties, including Facebook." Filing 1 at 26 (¶ 96). More specifically, Plaintiff avers,

> 98. To the extent information about any of the Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner; (ii) is not made available as part of the sign-up process; (iii) is not offered to users as [a] checkbox or e-signature field, or as any form of consent; and (iv) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

Filing 1 at 26 (¶ 98).

According to Plaintiff, Team Website users can subscribe to "newsletters," which include "email updates regarding the Team and content on the Team Website" and "links to the Team Website, which contains articles and videos." Filing 1 at 2 (¶ 3). Plaintiff alleges that users obtain access to the newsletters "in exchange for their contact information." Filing 1 at 2 (¶ 3). Plaintiff further alleges that, UNL "benefits from the value created through its use of free e-newsletters and its subscription-based service model ... through [the] interplay between it [sic] free newsletters and increasing traffic to its website" and "by creating brand awareness and broaden[ing] interest in the organization itself." Filing 1 at 25–26 (¶¶ 93–95). Plaintiff avers, "The sign-up processes for the Team Website's newsletters do not seek nor obtain informed, written consent." Filing 1 at 26 (¶ 97).

*3. Defendants' Alleged Use of Facebook Pixel to Capture Data*

**\*3** Plaintiff alleges that "on the Team Website ... subscribers' personal identifying information ('PII') [is] captured by the Facebook Pixel utilized by Defendants ... and then transferred to Facebook thereby exposing the subscribers' PII to any person of ordinary technical skill who received that data." Filing 1 at 2 (¶ 4). Plaintiff describes "Facebook Pixel" as "a toolset that allows websites to track user activity by monitoring for triggered events and sharing that data with Facebook," the popular social media website. Filing 1 at 14 (¶ 53). [4]

Plaintiff avers that Defendants are responsible for non-consensual data capture by Facebook Pixel:

9. Defendants purposefully implemented and utilized the Pixel, which tracks user activity on the Team Website and discloses that information to Facebook to gather valuable marketing data. The Pixel cannot be placed on a Team Website without steps taken directly by Defendants or on behalf of Defendants (e.g., by a website manager). The Pixel cannot be placed on the Team Website by Facebook without the knowledge and cooperation by Defendants.

10. Defendants do not seek and have not obtained consent from users or subscribers to utilize the Pixel to track, share, and exchange their PII and Video Watching Data with Facebook.

11. Defendants knew that their Pixel resulted in users' PII and Video Watching Data being shared (resulting in VPPA violations), and that they failed to obtain users' consent to allow their Pixel to operate in a way that shares users' protected information with Facebook.

...

65. The Pixel is a marketing tool that must be added by website developers to a website. A website must link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel. Thus, the addition of a Pixel to a website is an affirmative act that must be done purposefully. The Team went through, or directed its web site developers to go through, these steps to add the Pixel to its website.

...

68. The owner of a website – here, Defendants – holds the decision-making authority over the placement of the Pixel on its site. The owner may not hand-select every detail associated with the website, ranging from the use of certain font, colors, etc., to the employment of tracking tool, such as the Pixel, or a keystroking monitor, or which and whether terms and conditions should be associated with its website, newsletter, or any other aspect of its business. The level of management or oversight by the owner, however, does not alter or reduce, and certainly does not eliminate, its responsibility over the information displayed on its site, made available to visitors, or what is gathered about its user and then shared with third parties.

**\*4** 70. The website operator must utilize the tools made available to it by Facebook in order to cause the Pixel to be created and added to its site.

...

75. A Pixel cannot be placed on a website by a third-party without being given access by the site's owner. There are no known instances in which Facebook placed, or has been accused of placing, a Pixel on a website that it did not own.

Filing 1 at 3, 19–20 (¶¶ 9–11, 65, 68, 70). Thus, Plaintiff alleges that Defendants purposefully enabled Facebook Pixel to collect data from users of the Team Website.

Plaintiff also describes in detail the process by which Facebook Pixel operates to track and share user activity. *See* Filing 1 at 22–25 (¶¶ 78–92). [5] Plaintiff further avers that Defendants "are capable, at any time, of ending [the] improper sharing of subscribers' PII," "of stopping the employment and use of the Facebook Pixel," and "of ending [the] continued and ongoing VPPA violations." Filing 1 at 16 (¶ 57).

### C. Procedural Background

Plaintiff filed the Complaint against Learfield, Sidearm Sports, UNL, and the UNL athletic department on April 16, 2023. Filing 1. Plaintiff brought the Complaint "individually and on behalf of the following Class: All persons in the United States with a subscription to the Cornhuskers' Website that had their personal information improperly disclosed to Facebook through the use of the Pixel[.]" Filing 1 at 28 (¶ 107). The Complaint contains one Count, alleging

a violation of the Video Privacy Protection Act. Filing 1 at 31–34 (¶¶ 121–138). In addition to damages and attorneys' fees, Plaintiff also seeks declaratory and injunctive relief. Filing 1 at 35–36. On August 8, 2023, Plaintiff voluntarily dismissed UNL and the UNL athletic department as defendants. Filing 36; Filing 40. On August 14, 2023, Defendants filed the Motion to Dismiss now before the Court. Filing 37. Defendants seek dismissal "based on Learfield's sovereign immunity, failure to join indispensable parties, and failure to state a claim upon which relief can be granted." Filing 37. Defendants also challenged the VPPA as an unconstitutional violation of the First Amendment. Filing 38 at 17–21. On October 13, 2023, the United States intervened as an interested party to defend the constitutionality of the VPPA. Filing 48.

### II. Preliminary Matters

As discussed below, the Court concludes that Plaintiff failed to state a claim upon which relief can be granted because Plaintiff failed to allege that he was a "consumer" protected by the statute. Accordingly, although the United States intervened to defend the constitutionality of the VPPA, the Court need not consider Defendants' constitutional challenge to the statute. In addition, because Plaintiff failed to state a claim, he is not entitled to injunctive or declaratory relief.

### III. ANALYSIS

As discussed above, Defendants seek to dismiss the Complaint for lack of subject matter jurisdiction, for failure to join a necessary party, and for failure to state a claim. The Court will consider these arguments in turn.

### A. The Court Has Subject Matter Jurisdiction

#### 1. The Parties' Arguments

**\*5** Dismissal based on lack of subject matter jurisdiction under Rule 12(b)(1) is only raised insofar as Defendants contend that they have sovereign immunity as government contractors. Filing 38 at 3 ("Learfield is an arm of the state and, therefore, also immune from suit."). Defendants refer the Court to a Nebraska Supreme Court decision, which states that "the Board and the University of Nebraska are state agencies" and "a suit against a state agency is a suit against the state." *Doe v. Bd. of Regents of Univ. of Nebraska*, 280 Neb.

492, 510, 788 N.W.2d 264, 281 (2010). Defendants contend that they are arms of the state as "contractors for the UNL entities" and that Defendants and the UNL entities are alleged to have "collectively committed a singular violation of the VPPA." Filing 38 at 3.

Plaintiff disputes that Defendants are entitled to sovereign immunity, arguing instead that Defendants are independent from UNL. Filing 38 at 5–9. Regarding Defendants' independence, Plaintiff refers the Court to several allegations in his Complaint, Filing 43 at 6–7, which Plaintiff alleges Defendants "do not refute or address":

> 47. In addition to the control Operator Defendants [6] have over the operation, content, and overall management of the college team websites managed through the Operator Defendants' Web Services, Operator Defendants have the ability to unilaterally cut of or shut down college team websites.
>
> ...
>
> 52. Operator Defendants develop, operate, and own the Team Website. Operator Defendants effectively retain complete control of the Team Website. Operator Defendants have the ability to lock the client out of the Team Website; Operator Defendants derive revenue from the Team Website through revenue sharing with advertisers; Operator Defendants reserve their own advertising space on the Team Websites; and Operator Defendants set and implement [their] own code for generating and tracking advertising on the website, user tracking, video hosting, subscription services, and website design.
>
> ...
>
> 58. Operator Defendants also standardize, host, and control the video hosting services and the Team Website's video content.
>
> ...
>
> 61. Operator Defendants even manage the advertising for the Team Websites, for which they carve out their own advertising space and/or share in the revenue of the advertising on the team site. Operator Defendants' control over the advertising is highlighted by the presence of CBS code even where CBS does not host the Team's videos[.]
>
> ...

69. To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel. For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage by multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.

70. The website operator must utilize the tools made available to it by Facebook in order to cause the Pixel to be created and added to its site. The website operators name the Pixel.

71. Once the Pixel is created, the website operator will assign access to the Pixel to specific people for management purposes,44 as well as connect the Pixel to a Facebook Ad account.

...

96. The Team Website does not seek nor obtain permission from their subscribers, including Plaintiff and the Class, to share the subscribers' PII or Video Watching Data with third-parties, including Facebook.

**\*6** 97. The sign-up processes for the Team Website's newsletters do not seek nor obtain informed, written consent.

98. To the extent information about any of the Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner; (ii) is not made available as part of the sign-up process; (iii) is not offered to users as checkbox or e-signature field, or as any form of consent; and (iv) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

99. The Team Website includes a newsletter sign-up[.]

Filing 1 at 13–26 (¶¶ 47, 52, 58, 61, 69–71, 96–99). According to Plaintiff, these allegations show that Defendants are independent from UNL and are therefore not entitled to sovereign immunity. Filing 43 at 5–9. The Court agrees with Plaintiff.

*2. Applicable Standards*

a. Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for a pre-answer motion to dismiss for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). The Eighth Circuit Court of Appeals has explained that on a Rule 12(b)(1) motion,

> The plaintiff bears "the burden of proving the existence of subject matter jurisdiction," and we may look at materials "outside the pleadings" in conducting our review. [*Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013) (en banc)] (quoting *Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 856 (8th Cir. 2005)). Because of the "unique nature of the jurisdictional question," *Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990) (citation omitted), it is the court's duty to "decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue," *id.* at 730. As such, if the court's inquiry extends beyond the pleadings, it is not necessary to apply Rule 56 summary judgment standards. *Id.* at 729. Rather, the court may receive evidence via "any rational mode of inquiry," and the parties may "request an evidentiary hearing." *Id.* at 730 (quoting *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir. 1986)). Ultimately, the court must rule upon "the jurisdictional issue [unless it] is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue.' " *Id.* (quoting *Crawford*, 796 F.2d at 928).

*Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019); *Am. Fam. Mut. Ins. Co. v. Vein Centers for Excellence, Inc.*, 912 F.3d 1076, 1081 (8th Cir. 2019) ("[A] motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) raises a factual challenge to the court's jurisdiction, and courts may look to evidence outside the pleadings and make factual findings.") (citing *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018)).

The *Buckler* decision suggests that a challenge to subject matter jurisdiction pursuant to Rule 12(b)(1) is always "factual," but "facial" challenges are also possible:

**\*7** In deciding a motion under Rule 12(b)(1), the district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack

—where it may consider matters outside the pleadings. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). In a factual attack, the "non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* If the jurisdictional issue is "bound up" with the merits of the case, the district court may "decide whether to evaluate the evidence under the summary judgment standard." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018). This court is bound by the district court's characterization of the Rule 12(b)(1) motion. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) ("The method in which the district court resolves a Rule 12(b)(1) motion—that is, whether the district court treats the motion as a facial attack or a factual attack—obliges us to follow the same approach.").

*Croyle by & through Croyle v. United States*, 908 F.3d 377, 380–81 (8th Cir. 2018).

In their Reply Brief, Defendants designate their challenge as a "facial attack." Filing 49 at 5. Under these circumstances, Plaintiff is entitled to Rule 12(b)(6) "safeguards." *Croyle*, 908 F.3d at 380. The "safeguards" here mean that the Court must "accept 'the facts alleged in the complaint as true and draw[ ] all reasonable inferences in favor of the nonmovant.' " *Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (quoting *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021)). Plaintiff included arguments regarding sovereign immunity based on materials included in an index filed alongside Plaintiff's Brief in opposition to Learfield's Motion to Dismiss. Filing 43 at 7. However, because Defendants have designated their challenge as "facial," Filing 49 at 5, the Court will only consider the pleadings in ruling on the Rule 12(b)(1) Motion.

### b. Sovereign Immunity

The Court observes at the outset that most cases regarding claims of sovereign immunity do not involve corporate entities. *See, e.g.*, *Pub. Sch. Ret. Sys. of Missouri v. State St. Bank & Tr. Co.*, 640 F.3d 821, 826, 829 (8th Cir. 2011) (holding that sovereign immunity applied where "the State of Missouri created [the Public School Retirement System of Missouri] and [the Public Education Employee Retirement System of Missouri]" and where "Missouri statutes characterize the Retirement Systems as 'state agenc[ies]' "). Nevertheless, the Eighth Circuit has stated that "the ultimate question of whether an entity is an arm of a State for purposes of the Eleventh Amendment turns

on whether a State is the real party in interest in a case involving the entity." *Id.* at 826 (citing *Sherman v. Curators of the Univ. of Mo.*, 16 F.3d 860, 863 (8th Cir. 1994) ("Courts considering an entity's claim of eleventh amendment immunity must therefore determine whether the suit is in reality a suit against the state." (internal quotation marks omitted))). The "arm-of-a-State test requires a close analysis of [Learfield's] relationship with the State of [Nebraska]." *Id.* at 827. "Although whether [Defendants] are arms of the State of [Nebraska] is a question of federal law, [the Court must] engage in a detailed analysis of state law." *Id.* (citations omitted). Considerations under this test include (1) Defendants' "independence from the State of" Nebraska and (2) "how a money judgment in litigation involving [Defendants] could affect the State of [Nebraska's] treasury." *Id.* (citations omitted).

#### i. Operational and Political Independence

Regarding the "independence" consideration, the Court considers whether "state statutes greatly restrict [Defendants'] operational independence" and whether Defendants have "political independence" from the State of Nebraska. *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 828. "Courts generally assess an entity's independence in comparison to the type of independence that a political subdivision possesses." *Id.* at 826 (citations omitted). "The more an entity's independence resembles that of a political subdivision, the less likely the entity is an arm of a State." *Id.* (stating that " 'counties and similar municipal corporations' are not arms of States" (quoting *Mount Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977))). In addition, "characteristics of operational independence may include being organized as a 'body corporate,' possessing the ability to buy, sell, and hold property, and possessing the ability to sue and be sued in the entity's own name," but "possession of these powers ... does not preclude a finding that they are arms of the State." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 827–28 (noting that "[t]he Supreme Court has held an entity to be an arm of a State despite its ability to sue and be sued in its own name" and that "the Second Circuit has held an entity to be an arm of a State despite its designation as a corporate body" (citing *State Highway Comm'n of Wyoming v. Utah Const. Co.*, 278 U.S. 194, 199, 49 S.Ct. 104, 73 L.Ed. 262 (1929), and *McGinty v. New York*, 251 F.3d 84, 96 (2d Cir. 2001))).

### ii. Effect of a Money Judgment on the State

**\*8** Regarding whether or how a money judgment could impact the State's treasury, the Eighth Circuit has described "this factor as 'more important' than others when determining whether an entity is an arm of a State." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 830 (citation omitted). "If both 'legally and practically' a money judgment will have no [e]ffect on a State's treasury, then the entity is not an arm of a State." *Id.* (citation omitted). In addition, "an entity is more likely to be an arm of a State if a State makes annual appropriations to finance the entity's operating expenses or if a State retains custody over the entity's funds." *Id.*

### 3. Application

#### a. Plaintiff Alleges that Defendants Are Operationally and Politically Independent from the State of Nebraska

The Court first considers Defendants' operational and political independence from the State of Nebraska. As discussed above, Plaintiff alleges that "Defendants develop, operate, [ ] own[,] ... effectively retain complete control of ... [and] have the ability to lock the client [UNL] out of the Team Website." Filing 1 at 14 (¶ 52). Keeping in mind that the Court must "accept the facts alleged in the complaint as true," *Bauer*, 25 F.4th at 589, having "complete control of" the subject matter of this litigation—UNL's website—undoubtedly constitutes "operational independence." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 828. In addition, "as a 'body corporate' "—both Defendants are LLCs—"the ability to buy, sell, and hold property, and ... the ability to sue and be sued in the entity's own name" favors Defendants' operational independence. *Id.* at 827. Finally, there is nothing in Plaintiff's Complaint that suggests Defendants lack "political independence" from the State of Nebraska; rather, Defendants "represent[ ] more than 200 of the nation's top collegiate properties including the NCAA and its 89 championships, NCAA Football, leading conferences, and many of the most prestigious colleges and universities in the country." Filing 1 at 9 (¶ 31). This suggests that the politics of the State of Nebraska have little if anything to do with Defendants' independence. On the face of the Complaint, Defendants are independent from the State of Nebraska. This consideration weighs against finding that Defendants have sovereign immunity.

#### b. Defendants' Payment of a Money Judgment Would Not Impact Nebraska's Treasury

There are simply no facts in the Complaint suggesting that a money judgment against Defendants would somehow affect Nebraska's treasury. Nor is there any indication that Nebraska "makes annual appropriations to finance [Defendants'] operating expenses or ... retains custody over [Defendants'] funds." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 830. Therefore, this consideration also weighs against finding sovereign immunity.

#### c. Defendants Do Not Have Sovereign Immunity

As pleaded by Plaintiff, this is not a case where "a State is the real party in interest in a case involving the entity." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 826. Because neither consideration favors finding that Defendants have sovereign immunity, Defendants' Rule 12(b)(1) Motion to Dismiss for lack of subject matter jurisdiction is denied. As discussed above, this was a "facial attack" to subject matter jurisdiction, meaning the Court had to accept as true all Plaintiff's allegations in the Complaint. Therefore, this ruling would not preclude a later "factual" challenge to subject matter jurisdiction if Plaintiff's Complaint were to survive Defendants' Motion to Dismiss. *See* Rule 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Wagstaff & Cartmell, LLP v. Lewis*, 40 F.4th 830, 838 (8th Cir. 2022) ("Subject-matter jurisdiction can never be waived or forfeited." (citations omitted)).

### B. Plaintiff Did Not Fail to Join Any Indispensable Party

#### 1. The Parties' Arguments

**\*9** Defendants also moved to dismiss pursuant to Rule 12(b)(7) for failure to join (or more accurately, for voluntarily dismissing) UNL, which Defendants contend is a necessary party under Rule 19. Filing 37; Filing 38 at 11–12. Defendants argue that "the UNL Entities are necessary parties because Plaintiff's claims concern allegedly concerted conduct by the UNL Entities and Learfield, which allegedly produced a singular purported statutory violation." Filing 38 at 11. Defendants further argue that "without the UNL Entities, the Court cannot accord complete relief, and Learfield would face a substantial risk of incurring double or otherwise inconsistent

obligations, which would be very prejudicial to Learfield and could not be lessened or avoided." Filing 38 at 11. Finally, Defendants contend that UNL's "interest in the content and functionality of their own website and the information that is allegedly collected via the Facebook Pixel ... would be impaired in their absence." Filing 38 at 11. Because UNL has sovereign immunity, as discussed above, joining it as a party is not feasible, and Defendants ask the Court to dismiss the action "on equity and good conscience." Filing 38 at 11.

Plaintiff contends that dismissal pursuant to Rule 12(b) (7) is not appropriate because "[t]he UNL Entities are not indispensable parties"; rather, "Defendants do not present even a single scenario ... in which they would conceivably incur double obligations, or inconsistent obligations, or be prejudiced in any way" if UNL is not joined under Rule 19. Filing 43 at 16. Plaintiff also points out that "UNL Entities themselves do not maintain that they are indispensable or must be joined in this action. To the contrary, they engaged in the discussions that prompted and led to their dismissal from the action." Filing 43 at 17. Defendants in their Reply contend that Plaintiff's argument that the UNL Entities are not indispensable parties "makes no sense in light of the fact that this case concerns the UNL Entities' website." Filing 49 at 7.

### 2. Applicable Standards

Rule 12(b)(7) provides as a ground for dismissal a plaintiff's "failure to join a party under Rule 19." Rule 19(a)(1) states:

> (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). "The focus of Rule 19(a)(1) is on relief between the parties and not on the speculative possibility of further litigation between a party and an absent

person." *Cedar Rapids Bank & Tr. Co. v. Mako One Corp.*, 919 F.3d 529, 534–35 (8th Cir. 2019) (quoting *LLC Corp. v. Pension Ben. Guar. Corp.*, 703 F.2d 301, 305 (8th Cir. 1983)) (cleaned up). In addition, "a person does not become indispensable to an action to determine rights under a contract simply because that person's rights or obligations under an entirely separate contract will be affected by the result of the action." *Id.* at 535 (citation omitted). The Eighth Circuit has also rejected the "flawed premise that joint tortfeasors are necessary parties under Rule 19(b). 'It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit.' " *Lustgraaf v. Behrens*, 619 F.3d 867, 885 (8th Cir. 2010) (quoting *Bailey v. Bayer CropScience L.P.*, 563 F.3d 302, 308 (8th Cir. 2009)). Unlike a motion to dismiss for failure to state a claim under 12(b) (6), courts can consider materials beyond the pleadings on a motion to dismiss for failure to join a necessary party without converting the motion into one for summary judgment. *Cf.* Fed. R. Civ. P. 12(d).

### 3. Application

**\*10** The Court concludes that UNL is not an indispensable party. Complete relief may be accorded among the existing parties because Plaintiff alleges that Defendants are solely responsible for the alleged statutory violation. Contrary to Defendants' claims, Plaintiff does not allege "concerted conduct by the UNL Entities and Learfield, which allegedly produced a singular purported statutory violation," Filing 38 at 11; rather, as explained in the above discussion on sovereign immunity, Plaintiff alleges that Defendants Learfield and Sidearm Sports "develop, operate, [ ] own[,] ... effectively retain complete control of ... [and] have the ability to lock the client [UNL] out of the Team Website." Filing 1 at 14 (¶ 52). This allegation is inconsistent with "concerted conduct." The Court also disagrees with Defendants' contention that "Learfield would face a substantial risk of incurring double or otherwise inconsistent obligations." Filing 38 at 11. Defendants provide no reason to believe that their former co-Defendant, UNL, could have a VPPA claim against Defendants. Indeed, as discussed below, not even Plaintiff has a VPPA claim against Defendants. Finally, Defendants' averment that UNL will be deprived of its interests if not joined is unavailing. The State of Nebraska could have waived its sovereign immunity, *see, e.g.*, *Fryberger v. Univ. of Arkansas*, 889 F.3d 471, 473 (8th Cir. 2018) ("A State, however, may choose to waive its immunity in federal court at its pleasure." (quoting *Sossamon v. Texas*, 563 U.S. 277, 284, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011))), yet it did not. Thus, UNL is not a necessary party under Rule

19, and Defendants' Motion to Dismiss pursuant to 12(b)(7) is denied.

## C. Plaintiff Fails to State a Claim Upon Which Relief Can Be Granted

### 1. The Parties' Arguments

Plaintiff alleges in the Complaint that Defendants are "video tape service providers" (VTSPs) "because they create, host, and deliver hundreds of videos on [their] websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." Filing 1 at 32 (quoting 18 U.S.C. § 2710(a)(4)). Plaintiff alleges that he and other class members are " 'consumers' " because they subscribed to the Team newsletters." Filing 1 at 32 (quoting 18 U.S.C. § 2710(a)(1)). Finally, Plaintiff alleges that information disclosed by Defendants to Facebook constitutes "Plaintiff's and the Class members' personally identifiable information." Filing 1 at 32. Plaintiff avers that these allegations state a violation of the VPPA. Filing 1 at 31–35 (¶¶ 121–145).

Defendants argue the Complaint must be dismissed for several reasons. First, "Plaintiff does not—and cannot—allege that Learfield disclosed any information that would readily permit an ordinary person to determine Plaintiff's video viewing history." Filing 38 at 12. "Second, Plaintiff does not—and cannot—allege that he is a 'consumer' protected by the VPPA." Filing 38 at 13. Third, "Plaintiff does not—and cannot—allege the Learfield Defendants are 'VTSPs.' " Filing 38 at 16. Fourth, "Plaintiff does not—and cannot—allege that Learfield knowingly disclosed PII in violation of the VPPA." Filing 38 at 18.

### 2. Applicable Standards

#### a. 12(b)(6) Standards

The typical grounds for Rule 12(b)(6) motions are the insufficiency of the factual allegations offered to state claims. To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nevertheless, " 'threadbare recitals of the elements of a cause of action' cannot survive a [Rule 12(b)(6)] motion to dismiss." Du Bois v. Bd. of Regents of Univ. of Minnesota, 987 F.3d 1199, 1205 (8th

Cir. 2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Instead, as the Eighth Circuit Court of Appeals has explained, "A claim survives a Rule 12(b)(6) motion to dismiss only if the complaint's nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that the defendant is liable." Mitchell v. Kirchmeier, 28 F.4th 888, 895 (8th Cir. 2022) (quoting Iqbal, 556 U.S. at 680-83, 129 S.Ct. 1937). To put it another way, a court "must determine whether a plaintiff's complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " Far E. Aluminium Works Co. v. Viracon, Inc., 27 F.4th 1361, 1364 (8th Cir. 2022) (quoting Braden v. Wal–Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009)). Thus, "[a] claim is plausible when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " Christopherson v. Bushner, 33 F.4th 495, 499 (8th Cir. 2022) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). In contrast, " '[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility.' " Id. (internal quotation marks and citations omitted). The Eighth Circuit Court of Appeals has cautioned that "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Braden, 588 F.3d at 594.

**\*11** In ruling on a Rule 12(b)(6) motion, a court must "accept 'the facts alleged in the complaint as true and draw[ ] all reasonable inferences in favor of the nonmovant.' " Bauer, 25 F.4th at 589. On the other hand, "[m]ere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." Richardson v. BNSF Ry. Co., 2 F.4th 1063, 1068 (8th Cir. 2021) (internal quotation marks and citations omitted). A court also need not accept a pleader's "legal conclusions drawn from the facts." Knowles v. TD Ameritrade Holding Corp., 2 F.4th 751, 755 (8th Cir. 2021).

Rule 12(b)(6) also permits dismissal when a claim is not cognizable under applicable law. See, e.g., Couzens v. Donohue, 854 F.3d 508, 517 (8th Cir. 2017) (dismissal was appropriate where Missouri did not recognize a claim for false light invasion of privacy); Thomas v. Bd. of Regents of Univ. of Nebraska, No. 4:20CV3081, 2022 WL 1491102, at *18 (D. Neb. May 11, 2022) (agreeing with defendant that the plaintiffs had failed to state a claim, because a disparate-impact claim is not cognizable under the Equal

Protection Clause); *Freeney v. Galvin*, No. 8:19CV557, 2020 WL 229996, at *2 (D. Neb. Jan. 15, 2020) (finding the plaintiff failed to state a § 1983 claim against the manager of his private place of employment because such a claim is not cognizable where a private person is not a state actor or engaged in joint action with the state or its agents). In such cases, the plaintiff failed to state a claim that was legally cognizable as opposed to factually plausible.

### b. Statutory Interpretation Standards

Standards for statutory interpretation are familiar. "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others[:] ... courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Thus, "[t]he starting point for interpreting a statute is the language of the statute itself." *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 824 (8th Cir. 2010) (cleaned up). The Court's "job is to interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, ––– U.S. ––––, 138 S. Ct. 2067, 2070, 201 L.Ed.2d 490 (2018). The ordinary meaning controls "unless the context in which the word[s] appear[ ]" suggests otherwise. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012). "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006). The Court aims "to avoid interpreting a statute in a manner that renders any section of the statute superfluous or fails to give effect to all of the words used by Congress." *Westerfeld*, 621 F.3d at 824.

### 3. The VPPA Statute

The VPPA statute provides, "A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b). The statute defines the terms "consumer," "personally identifiable information," and "video tape service provider," as follows:

(a) **Definitions**.--For purposes of this section--

(1) the term "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider;

**\*12** ...

(3) the term "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and

(4) the term "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure.

18 U.S.C. § 2710(a). Thus, to state a claim, Plaintiff must have alleged that (1) he is a "consumer" (2) whose "personally identifiable information" (3) was knowingly disclosed by a "video tape service provider." The Court concludes that Plaintiff has not plausibly alleged he is a "consumer" within the meaning of the VPPA.

### 4. Plaintiff Is Not a Consumer Within the Meaning of the VPAA

#### a. Defendants' Arguments that Plaintiff Is Not a Consumer

In their briefs, Defendants raised three arguments that Plaintiff is not a "consumer" within the meaning of the VPPA, but the Court only finds the third persuasive. Defendants first contend that Plaintiff failed to allege he is a "consumer" because there is not "a single allegation showing that Plaintiff rented, purchased, or subscribed to any goods or services *from Learfield*," specifically. Filing 38 at 13 (emphasis in original). Plaintiff disputes Defendants' contention that Plaintiff did not consume goods or services from Learfield specifically, stating, "Defendants are the owners and operators of the Team Website at issue and directly solicited Plaintiff's contact information in exchange for the Team Website's newsletter subscription." Filing 43 at 12. The Court disposes of Defendants' first argument, having already found above that Plaintiff alleged Defendants have "complete control of the team website," Filing 1 at 14 (¶ 52), meaning that

any goods or service that Plaintiff "consumed" were from Defendants.

Defendants further argue that "Plaintiff is not a consumer protected by the VPPA" because "Plaintiff is a consumer of other products or services unrelated to rental, sale, or delivery of video materials." Filing 38 at 14. Plaintiff responds that "[t]he VPPA does not define or otherwise restrict the meaning of 'consumer' to a person who subscribes to goods or services constituting 'audio visual materials.' " Filing 43 at 13. The Court also disposes of this argument because "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank*, 503 U.S. at 253–54, 112 S.Ct. 1146, and there is nothing in the statutory language that restricts "goods or services" to "video materials," as Defendants contend. The statute only restricts the "goods or services" to those obtained "from a video tape service provider." *18 U.S.C. § 2710(a)(1)*. There is nothing about "the context in which the word[s] appear[ ]" that suggests otherwise. *Taniguchi*, 566 U.S. at 569, 132 S.Ct. 1997.

**\*13** Defendants make one final argument that Plaintiff is not a consumer: that "signing up for an email newsletter does not make a person a 'consumer' under the VPPA." Filing 49 at 8. By this, the Court understands Defendants to argue that Plaintiff does not allege adequate "factual allegations [to] meet the standard for a 'consumer' " within the meaning of the VPPA. Filing 49 at 8. Defendants' full argument on this point is as follows:

> [S]ince the time Learfield filed its opening brief, another court dismissed VPPA claims asserted against Learfield in a case raising similarly deficient factual allegations brought by this same Plaintiff's counsel, on the basis that signing up for an email newsletter does not make a person a "consumer" under the VPPA. *Edwards[ v. Learfield Commc'ns, LLC*, No. 1:23-cv-65, —— F. Supp. 3d ——, ——, 2023 WL 8544765 (N.D. Fla. October 6, 2023), at \*14]* ("Plaintiffs' signing up for email updates here did not make them 'subscribers.' Signing up requires no 'durable' commitment or real exchange at all ... Signing up does not grant access to any exclusive or restricted content, much less any exclusive video content."). In doing so, *Edwards* held that such factual allegations did not meet the standard for a "consumer" articulated by the Eleventh Circuit in *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1342-43 (11th Cir. 2017) and *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015).

Filing 49 at 8; *see also* Filing 49-1 (copy of *Edwards*). The Court acknowledges that this argument is different from Defendants' earlier argument that "Plaintiff is not a consumer protected by the VPPA" because "Plaintiff is a consumer of other products or services unrelated to rental, sale, or delivery of video materials," Filing 38 at 14, where the present argument does not focus on Plaintiff's consumption of products "unrelated to rental, sale, or delivery of video materials." Instead, the present argument focuses on whether "signing up for an email newsletter ... meet[s] the standard for a 'consumer' " under the VPPA. Filing 49 at 8. The Court further acknowledges that Defendants made this argument in their Reply Brief.

The Eighth Circuit has stated that normally, courts "refuse to entertain [ ] new argument[s]" that are "assert[ed] for the first time in [a] reply brief." *Berg v. Norand Corp.*, 169 F.3d 1140, 1146 (8th Cir. 1999). In addition, the Eighth Circuit has stated, "The district court d[oes] not abuse its discretion or otherwise commit error by following the court's local rule prohibiting new arguments submitted in a reply brief." *McGhee v. Pottawattamie Cnty., Iowa*, 547 F.3d 922, 929 (8th Cir. 2008). The pertinent local rule provides, "The reply brief may not merely repeat the moving party's initial arguments, but rather must address factual or legal issues raised in the opposing brief. Without leave of court, a reply brief may not raise new grounds for relief or present matters that do not relate to the opposing party's response." NECivR 7.1(c)(2). However, in this case, the local rule did not prohibit Defendants from making the argument in their Reply Brief that "signing up for a newsletter does not make a person a 'consumer' " under the VPPA because this argument is in reply to the following argument raised by Plaintiff in his Opposition Brief:

> On the Team Website, users have the option to subscribe to e-newsletters by providing their contact information, in exchange for an exclusive, scheduled newsletter. These allegations satisfy the 'consumer' element of the VPPA, because the commitment between Operator Defendants to supply periodic newsletters in exchange for Plaintiff's

personal contact information is all that
the VPPA requires.

**\*14**  Filing 38 at 18. In essence, Plaintiff argues in
Opposition that signing up for a newsletter ("providing
their contact information, in exchange for an exclusive,
scheduled newsletter") makes Plaintiff a "consumer" under
the VPPA, and Defendant argues in Reply that it does not.
Thus, this is not a "new argument" raised "for the first
time" in Defendants' "reply brief." *See Berg,* 169 F.3d at
1146. Rather, Defendants argument "relate[s] to the opposing
party's response" and "address[es] factual or legal issues
raised in the opposing brief." NECivR 7.1(c)(2). In addition,
the Eighth Circuit has also stated that a district court does
not have to allow a non-movant to file a sur-reply if the
movant "simply responded to issues raised by" the non-
movant's opposition brief, as Defendants did here. *Cornice
& Rose Int'l, LLC v. Four Keys, LLC,* 76 F.4th 1116, 1123
(8th Cir. 2023). Therefore, the Court will consider Defendants
argument that "signing up for a newsletter does not make a
person a 'consumer' " under the VPPA.

The Court must determine whether Plaintiff alleges adequate
"factual allegations [to] meet the standard for a 'consumer'
" within the meaning of the VPPA. Filing 49 at 8. Plaintiff
does not argue that he is a "purchaser" or "renter," so the
Court must only determine whether he has alleged he is a
"subscriber of goods or services from a video tape service
provider." 18 U.S.C. § 2710(a). The Court concludes that
Plaintiff has not alleged he is a "subscriber," meaning he is
not a "consumer" afforded protection by the VPPA.

### b. A Survey of Dictionary and
### Court Definitions of "Subscriber"

The VPPA statute does not state what it means to be a
"subscriber of goods or services from a video tape service
provider." *See generally,* 18 U.S.C. § 2710. Nor does any
party refer the Court to Eighth Circuit or Supreme Court
precedent bearing on what it means to be a "subscriber."
Therefore, because this is a question of first impression for
the Court, the Court will examine how various dictionaries
and courts have defined the term.

Black's Law Dictionary defines "subscribe," in relevant part,
as "To agree to take and pay for something, esp[ecially]
something regularly delivered; esp[ecially], to pay money,

usu[ally] annually, to receive a weekly or monthly service,
such as a newspaper or magazine." Black's Law Dictionary
1727 (11th ed. 2019). Editions of Black's Law Dictionary
more contemporaneous to the passage of the VPPA similarly
include some kind of payment within the meaning of
"subscribe." Black's Law Dictionary 1596 (4th ed. 1968)
(defining "subscribe," in relevant part, as "to agree in writing
to furnish money or its equivalent"); Black's Law Dictionary
1427 (6th ed. 1990) (same). Plaintiff appears to acknowledge
that some form of transaction is required for a subscription,
arguing that users "providing their contact information,
in exchange for an exclusive, scheduled newsletter ...
satisf[ies] the 'consumer' element of the VPPA, because
the commitment between Operator Defendants to supply
periodic newsletters in exchange for Plaintiff's personal
contact information is all that the VPPA requires." Filing 43
at 11.

Courts have reached differing definitions of what it means
to "subscribe" within the meaning of the VPPA. On the
one hand, the Eleventh Circuit held that a plaintiff who
merely downloaded an app to watch video clips was not
a "subscriber" within the meaning of the VPPA, reasoning
that " 'subscription' involves some type of commitment,
relationship, or association (financial or otherwise) between
a person and an entity," such as "payment, registration,
commitment, delivery, expressed association, and/or access
to restricted content." *Ellis v. Cartoon Network, Inc.,* 803
F.3d 1251, 1256 (11th Cir. 2015) (citation omitted). In *Ellis,*
the court stated that a person who "is free to delete the app
without consequences whenever he likes, and never access
its content again" is not a subscriber under the VPPA, noting
that "downloading [ ] an app, we think, is the equivalent of
adding a particular website to one's Internet browser as a
favorite, allowing quicker access to the website's content." *Id.*
at 1257. However, the *Ellis* court stated that "payment is not
a necessary element of subscription." *Id.* at 1256.

**\*15**  The Southern District of New York has interpreted
"subscriber" slightly differently than the Eleventh Circuit, but
still requiring a "durable affiliation" and a "relationship and
exchange" to qualify as a "subscriber," stating,

> Whatever the nature of the
> specific exchange, what remains
> is the subscriber's deliberate and
> durable affiliation with the provider:
> whether or not for payment, these

arrangements necessarily require some sort of ongoing relationship between provider and subscriber, one generally undertaken in advance and by affirmative action on the part of the subscriber, so as to supply the provider with sufficient personal information to establish the relationship and exchange.

*Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015). The Court recognizes the above tests both require some exchange of consideration, although not necessarily money, between the alleged "subscriber" and the VTSP to constitute a "subscription."

On the other hand, the First Circuit appears to require only consideration from the alleged subscriber in the form of providing personal information. *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 487 (1st Cir. 2016). In *Yershov*, the First Circuit acknowledged that the definition of "subscriber" contemporary to the VPPA may have required some form of valuable consideration, as follows:

[T]here are other common definitions of the term "subscribe" that include as an element a payment of some type and/or presume more than a one-shot transaction. *See The Random House Dictionary of the English Language* 1896 (2nd ed. 1987) (defining the term "subscriber" as "a person ... that subscribes ... to a publication," the term "subscribes" as "to obtain a subscription," and the term "subscription" as "the right to receive a periodical for a sum paid, usually for an agreed number of issues").

*Yershov*, 820 F.3d at 487. Despite this recognition that in 1987, shortly before the VPPA was enacted, "subscriptions" were understood to "include as an element a payment of some type," the First Circuit concluded that the plaintiff was a subscriber because "[w]hile [the plaintiff] paid no money, access was not free of a commitment to provide consideration in the form of that information"—namely, the plaintiff's "Android ID and [ ] mobile device's GPS location"—"which was of value to [the VTSP]." *Id.* at 489. In other words, the First Circuit held that merely providing some personal identifying information could constitute the "consideration" necessary for a "subscription," whereas the Eleventh Circuit requires more consideration in the form of "payment, registration, commitment, delivery, [ ] or access

to restricted content," which seemingly precludes the mere exchange of personal information. *Ellis*, 803 F.3d at 1256.

### c. The Definition of "Subscriber" Most Consistent with the Word's Original Ordinary Meaning

The Court must define "subscriber" in the way most "consistent with [its] ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd.*, 138 S. Ct. at 2070. The main disagreement between the Eleventh Circuit and the First Circuit regards the type of consideration required for a user to be considered a "subscriber" within the meaning of the VPPA: the Eleventh Circuit requires "payment, registration, commitment, delivery, [ ] or access to restricted content," which appears to preclude the possibility that mere provision of personal information could serve as consideration, *Ellis*, 803 F.3d at 1256, whereas the First Circuit has held that there could be "consideration in the form of [personal] information," *Yershov*, 820 F.3d at 489. Both courts require some exchange of "consideration" between the alleged "subscriber" and the VTSP, *see Yershov*, 820 F.3d at 489, but neither requires the "subscriber" to provide monetary consideration. *See Ellis*, 803 F.3d at 1256. To the contrary, dictionary definitions of "subscribe" contemporaneous to the VPPA include some form of monetary consideration. *See* Black's Law Dictionary 1596 (4th ed. 1968) (defining "subscribe," in relevant part, as "to agree in writing to furnish money or its equivalent"); Black's Law Dictionary 1427 (6th ed. 1990) (same). Accordingly, the Court disagrees with both the First and Eleventh Circuits and instead adopts the dictionary definition of "subscription" contemporaneous with the adoption of the VPPA, which requires monetary consideration. Thus, the Court holds that a "subscription" requires a "subscriber" "to furnish money or its equivalent."

**\*16** This definition is most "consistent with [the word's] ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd.*, 138 S. Ct. at 2070. In 1988, when Congress passed the VPPA, Plaintiff's relationship with Defendants —that is, Plaintiff's exchange of personal information for email updates from Defendants—was likely not considered a "subscription." *Cf.* Filing 43 at 11 (Plaintiff arguing that "the commitment between Operator Defendants to supply periodic newsletters in exchange for Plaintiff's personal contact information is all that the VPPA requires" for an individual to be a "consumer"). As discussed above, in 1988, a "subscription" was commonly understood to mean "the right to receive a periodical for a sum paid, usually for

an agreed number of issues." Random House Dictionary 1896 (2nd ed. 1987). Conversely, the word "subscription" in modern parlance has taken on a new meaning, understood in certain contexts to mean "[t]he fact or action of subscribing to an electronic mailing list, newsgroup, etc." Oxford English Dictionary 6.d., https://www.oed.com/dictionary/ subscription_n?tab=meaning_and_use#20093941; *see also* Oxford English Dictionary II.9.f., https://www.oed.com/ dictionary/subscribe_v?tab=meaning_and_use#20092561 (defining "subscribe" as "[t]o become a subscriber to an electronic mailing list, newsgroup, etc. Occasionally in imperative, as an email command.... Typically no payment is required for subscriptions of this type."). Thus, the definition of "subscription" at the time the VPPA was enacted included a monetary exchange or its equivalent between provider and subscriber, whereas the "modern" definition may include "signing up" for free email updates by providing personal information. The tests employed by the First Circuit and the Eleventh Circuit may be more consistent with "modern" definition of "subscriber," but the Court's "job is to interpret the words consistent with their ordinary meaning at the time Congress enacted the statute," *Wis. Cent. Ltd.*, 138 S. Ct. at 2070, meaning the contemporaneous definition supersedes any modern definition. Therefore, because the meaning of the statutory term is the same today as it was in 1988, an individual must "furnish money or its equivalent" to the VTSP to qualify as a "subscriber" within the meaning of the VPPA.

Bolstering this conclusion that using the "modern" definition is inappropriate, it is unlikely that Congress included "subscribers" in the VPPA to protect individuals like Plaintiff who signed up for email alerts informing the user that new videos have been posted for public access on the internet —where the internet was not in existence "at the time Congress enacted the statute." *Wis. Cent. Ltd.*, 138 S. Ct. at 2070. Indeed, the Court observes that "the world wide web was not developed until 1989," a year after the VPPA was enacted. *Kubota Corp. v. Shredderhotline.com Co., Inc.*, No. 12-CV-6065, 2013 WL 6096999, at *4 (N.D. Ill. Nov. 20, 2013); *see also Emps. Ins. of Wausau v. McGraw-Edison Co.*, No. 4:86-CV-48, 2016 WL 316727, at *1 (W.D. Mich. Jan. 27, 2016) (subsequent history omitted) (noting that "1989 ... was the same year that English scientist Tim Berners-Lee invented the World Wide Web"). In this context, the likelihood that Congress in 1988 would have understood "subscriber" to include joining a next-generation mailing list is slim at best. *See Wis. Cent. Ltd.*, 138 S. Ct. at 2074 ("[I]t's a 'fundamental canon of statutory construction' that words

generally should be 'interpreted as taking their ordinary, contemporary, common meaning ... at the time Congress enacted the statute.' " (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979))).

In addition, the Court disagrees with the First Circuit's reasoning in *Yershov* that "if the term 'subscriber' required some sort of monetary payment, it would be rendered superfluous by the two terms preceding it" (*i.e.*, "purchaser" and "renter"). *Yershov*, 820 F.3d at 487. Like the First Circuit in *Yershov*, this Court aims "to avoid interpreting a statute in a manner that renders any section of the statute superfluous or fails to give effect to all of the words used by Congress." *Westerfeld*, 621 F.3d at 824 (cleaned up). Nevertheless, according to definitions of the terms contemporaneous to the VPPA, a "purchaser" is "[o]ne who acquires either real or personal property by buying it for a price in money; a buyer; vendee." Black's Law Dictionary, 1235 (6th ed. 1990). A "renter" is someone who pays "rent," or "consideration ... for use or occupation of property." Black's Law Dictionary, 1297 (6th ed. 1990); *see also Yershov*, 820 F.3d at 488 ("Presumably a person in 1988 who exchanged payment for a copy of a video either retained ownership of the video outright, thereby becoming a 'purchaser' of the video, or received temporary possession of the video for a set period of time, thereby becoming a 'renter.' "). Conversely, "subscriber" is someone who enters into a "subscription," which is a "written contract by which one engages ... to contribute a sum of money ... in consideration of an equivalent *to be rendered*, as a subscription to a periodical, a forthcoming book, a series of entertainments, or the like." Black's Law Dictionary, 1427 (6th ed. 1990) (emphasis added). Thus, a "subscriber" obtains future rights in "forthcoming" property or to a "series" of or "periodic" property, whereas a "purchaser" or "renter" obtains present rights to ownership or use/occupation, respectively. This sufficiently differentiates the subscriber on the one hand from the purchaser or renter on the other. Thus, the term "subscriber" is not rendered superfluous in the statute by requiring some form of payment to the provider as opposed to the mere provision of personal information. *Ellis*, 803 F.3d at 1256. Accordingly, the Court must determine whether Plaintiff exchanged monetary consideration or its equivalent to qualify as a "subscriber" within the meaning of the VPPA.

### d. Under this Definition, Plaintiff Is Not a "Subscriber"

**\*17**  The Court will recount the facts related to Plaintiff's alleged relationship to the UNL newsletters:

3. On the Team Website, Defendants offer the option for users to subscribe: (i) through ongoing e-newsletters; and (ii) through signing up for ticket purchasing accounts. Newsletter subscribers are given email updates regarding the Team and content on the Team Website in exchange for their contact information. The newsletter email updates include links to the Team Website, which contains articles and videos.

...

D. E-Newsletters and E-Subscriptions, Even When Free to Users, Are a Value Exchange Between the Cornhuskers and Subscribers

93. The Cornhuskers benefits from the value created through [their] use of free e-newsletters and [their] subscription-based service model.

94. E-newsletters are an important and effective business tool. In fact, 31% of business-to-business marketers say that sending e-newsletters is the paramount way to nurture leads. Additionally, visitors who reach web pages through e-mails, such as e-newsletters, view more pages per session (2.5 to 1.2), as well as visiting web pages more often than those referred to web pages from Facebook. Web page visits stemming from e-mails are also more engaged than those from any other platform. The Cornhuskers, through [their] interplay between it [sic] free newsletters and increasing traffic to [their] website, recognized and utilized this business tool.

95. E-newsletters further provide value by creating brand awareness and broaden interest in the organization itself. The Cornhuskers' newsletter effectively served to provide this value.

Filing 1 at 2, 25–26 (¶¶ 3, 93–95). These allegations indicate that the only transaction between Plaintiff and Defendants was that Plaintiff "exchange[d] ... contact information" for Defendants' newsletters, which were comprised of free email updates regarding Nebraska Cornhusker athletics.

Under the definition of "subscription" adopted by the Court above, Plaintiff's mere exchange of personal information and occasional clicks on links contained in the newsletters to videos on the Team Website [7] do not suffice to make Plaintiff a "subscriber." This is so for the simple reason that

he never provided monetary consideration or its equivalent in exchange for the newsletters. "Contact information" was likely not considered the equivalent of monetary consideration in 1988; indeed, the VPPA statute itself appears to minimize the importance of "disclosure ... solely of the names and addresses of consumers." 18 U.S.C. § 2710(b)(2)(D); *see also* Filing 1 at 2 (¶ 2) (Plaintiff only alleging that he provided "contact information" to sign up for the newsletter). Under the VPPA, disclosing "to any person" information relating to which "specific video materials" a consumer "requested or obtained" requires "informed, written consent ... of the consumer." *Id.* § 2710(b)(2)(B). Conversely, disclosing "to any person" a consumer's "name[ ] and address[ ]" (which the Court understands to be "contact information") is permitted so long as the consumer has been "provided ... the opportunity ... to prohibit such disclosure." *Id.* § 2710(b)(2)(D)(i); *see also id.* § 2710(b)(2)(D)(ii) (providing that this section is inapplicable if "the disclosure ... identif[ies] the title, description, or subject matter of any video tapes or other audio visual material"). This shows that, when Congress enacted the VPPA, an individual's "contact information" was not considered to be a particularly valuable interest, leading the Court conclude that "contact information" was not sufficiently important to constitute an equivalent to monetary consideration. Therefore, because Plaintiff only provided "contact information" as consideration —which is not "money or its equivalent"—for Defendants' newsletter, the Court holds that Plaintiff is not a "subscriber" within the meaning of the VPPA.

**\*18**  The Court also concludes that, even if merely exchanging personal information *could* constitute an equivalent to the monetary consideration required to form a "subscription," Plaintiff has not alleged facts indicating that is the case here. Plaintiff does not explain how giving his personal contact information to Defendants benefitted Defendants in any way to constitute consideration. Plaintiff does not allege, for example, that Defendants ever used Plaintiff's personal contact information to solicit donations or advertise merchandise. To the contrary, it appears that Plaintiff "is free to [unsubscribe] without consequences whenever he likes, and never access [the newsletter] content again." *Ellis,* 803 F.3d at 1257. The Court is satisfied that the Plaintiff's provision of "contact information" was not the equivalent of monetary consideration.

Alternatively, the Court holds that even if the lessened standard adopted by the Eleventh Circuit were to apply, Plaintiff would not qualify as a "subscriber." The present

case is similar to *Ellis*, where the Eleventh Circuit found the plaintiff was not a subscriber due to the limited nature of his "commitment, relationship, or association (financial or otherwise)" (a noticeably more lenient test than the one applied herein) with the VTSP, observing:

> Mr. Ellis did not sign up for or establish an account with Cartoon Network, did not provide any personal information to Cartoon Network, did not make any payments to Cartoon Network for use of the CN app, did not become a registered user of Cartoon Network or the CN app, did not receive a Cartoon Network ID, did not establish a Cartoon Network profile, did not sign up for any periodic services or transmissions, and did not make any commitment or establish any relationship that would allow him to have access to exclusive or restricted content. Mr. Ellis simply watched video clips on the CN app, which he downloaded onto his Android smartphone for free. In our view, downloading an app for free and using it to view content at no cost is not enough to make a user of the app a "subscriber" under the VPPA, as there is no ongoing commitment or relationship between the user and the entity which owns and operates the app. Importantly, such a user is free to delete the app without consequences whenever he likes, and never access its content again. The downloading of an app, we think, is the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content. Under the circumstances, Mr. Ellis was not a "subscriber" of Cartoon Network or its CN app.

*Ellis*, 803 F.3d at 1257.

Like in *Ellis*, Plaintiff Peterson does not allege that he made any payments to the Team Website, nor that he became a registered user of the Team Website, nor that he established a Team Website profile, nor that he had access to any exclusive or restricted content. *See id.* One difference between *Ellis* and the present case is that Plaintiff Peterson "sign[ed] up for [ ] periodic services or transmissions" in the form of the email update newsletters, whereas the *Ellis* plaintiff accessed videos on the CN app at his own convenience. *Id.* However, Plaintiff Peterson does not allege that the newsletters contained embedded videos that he watched— at most, Plaintiff Peterson interacted with links to videos on the Team Website contained within the newsletters, like the plaintiff in *Ellis*, at his own convenience. Another difference is that Plaintiff Peterson can be considered to have "registered" for the newsletters, but the Court sees no significant difference between "registering" an account by entering contact information and downloading an app to a device; if anything, dedicating memory space on a device to an app seems to be a greater "commitment" than signing up for emails. *Id.* Thus, the Court concludes that the relationship between Plaintiff Peterson and Defendants is sufficiently similar to the relationship between the "subscriber" and the provider in *Ellis*, where the Eleventh Circuit found the plaintiff was not a "subscriber." *Id.* at 1256. Specifically, Plaintiff Peterson's use of the newsletter is more like "the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content," than it is to being a "subscriber." *Id.*; *see also* Filing 49-1 (providing a copy of *Edwards v. Learfield Commc'ns, LLC*, No. 1:23-cv-65, ——— F. Supp. 3d ———, ———, 2023 WL 8544765 (N.D. Fla. October 6, 2023), where a court granted a 12(b)(6) motion to dismiss VPPA claims against Defendants Learfield and Sidearm Sports on similar facts, stating, "Just as downloading a free app did not create a subscription in *Ellis* ... Plaintiffs' signing up for email updates here did not make them 'subscribers.' Signing up requires no 'durable' commitment or real exchange at all." (quoting *Austin-Spearman*, 98 F. Supp. 3d at 669)). Therefore, as an alternative holding, even under the more lenient test in *Ellis*, Plaintiff is not a "subscriber" within the meaning of the VPPA. [8]

**\*19** Because the Court concludes that Plaintiff is not a "consumer" within the meaning of the VPPA, the Court need not consider whether the information allegedly conveyed to Facebook was "personally identifiable information" or whether Defendants are "video tape service provider[s]." 18 U.S.C. § 2710(b). Because Plaintiff is not a "consumer,"

Plaintiff's Complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Far E. Aluminium Works Co.*, 27 F.4th at 1364. Therefore, Plaintiff has failed to state a claim under the VPPA, and Defendants are entitled to dismissal pursuant to Rule 12(b)(6).

### e. The VPPA Is Not Fit to Address Data Privacy Issues Stemming from Free Online Video Streaming

The Court is aware that data privacy is a sensitive issue and that the VPPA was enacted to protect this privacy. Nevertheless, because the Court must "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute," *Wis. Cent. Ltd.*, 138 S. Ct. at 2070, the Court is not permitted to contort old law to fit new circumstances. This case illustrates the uncomfortable fit of the VPPA to free video streaming services: If Plaintiff accessed free videos on the Team Website by simply typing "huskers.com" into his web browser, he would undoubtedly not be a "renter, purchaser, or subscriber of goods or services," meaning he and members of his class would have no VPPA claim for having his PII allegedly disclosed to Facebook. However, because Plaintiff "subscribes" (in a modern sense unforeseen by the statute) to a free newsletter that contains links to these free videos, which anyone can freely access on the Team Website without first subscribing to the newsletter, Plaintiff argues that he and all other newsletter subscribers are entitled to relief under the VPPA, including not less than $2,500 in liquidated damages to each class member and injunctive relief. This argument fails not only as a matter of statutory interpretation but also as a matter of common sense. Absent any federal statute prohibiting the sharing of personal identifying information with Facebook, plaintiffs should seek protection through the ordinary legislative process rather than through the courts.

## IV. CONCLUSION

For these reasons, the Court grants Defendants' Motion to Dismiss. The Court has subject matter jurisdiction over the claims because Defendants are not entitled to sovereign immunity. The Court also declines to dismiss the claim pursuant to Rule 12(b)(7) because Plaintiff did not fail to join a necessary party. However, the Court grants Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) because Plaintiff is not a "consumer" and therefore failed to state a claim under the VPPA.

IT IS ORDERED that Defendants' Motion to Dismiss, Filing 37, is granted.

### All Citations

--- F.Supp.3d ----, 2023 WL 9106244

## Footnotes

1   Plaintiff alleges, "In 2014, Learfield purchased Sidearm Sports." Filing 1 at 5 (¶ 17). Accordingly, the Court at times refers to Learfield and Sidearm Sports collectively as "Learfield."

2   Plaintiff originally brought claims against UNL and the UNL athletic department. Filing 1. Plaintiff voluntarily dismissed the UNL Defendants. Filing 36; Filing 40. Defendants Learfield and Sidearm Sports are the only remaining defendants.

3   The Court refers to the Senate Report solely to provide background information regarding the VPPA.

4   In addition to Facebook Pixel, Plaintiff alleges that "Defendants consistently uses [sic] tracking tools, such as pixels (including Facebook's and [their] own), Google's suite of tools (including Google Analytics and Doubleclick Floodlight), comScore, and Salesforce DMP." Filing 1 at 14 (¶ 53). Specifically, Plaintiff alleges that its own pixel (the Sidearm Pixel) "is also used to monitor user activity on the Team Websites," including by "track[ing] which webpages a user visits, when those webpages were published, [ ] which sport a user interacts with," and "which embedded videos, pre-recorded and streaming, were watched on any given webpage."

Filing 1 at 14–15 (¶¶ 54–55). Plaintiff avers that the data captured by the Sidearm pixel is not provided to UNL but is instead "retained for [Defendants'] own use." Filing 1 at 16 (¶ 56). However, Plaintiff does not allege that use of any tracking tools besides Facebook Pixel violated the VPPA. *Cf.* Filing 1 at 28 (¶ 107) ("Plaintiff brings this action individually and on behalf of the following Class: All persons in the United States with a subscription to the Cornhuskers' Website that had their personal information improperly disclosed to Facebook through the use of the Pixel[.]").

5    Because this detailed technical information is not pertinent to the analysis in this case, the Court omits it.

6    Plaintiff uses the term "Operator Defendants" to refer to Learfield and Sidearm Sports when the UNL entities were still parties to the case.

7    Plaintiff alleges that he watched videos on the Team Website, *see* Filing 1 at 4 (¶ 15), but not that he ever interacted with the newsletters or uses the links allegedly contained within the newsletters to access those videos. The Court will nonetheless infer that he did use links in the newsletter, "drawing all reasonable inferences in favor of the nonmovant." *Bauer*, 25 F.4th at 589. In any case, clicking on links does not indicate the type of "payment, registration, commitment, delivery, [ ] or access to restricted content" required to constitute a subscription. *Ellis*, 803 F.3d at 1257.

8    The Court concedes that under the First Circuit's test in *Yershov*, where providing personal information constitutes the consideration required to form a subscription, Plaintiff would be considered a "consumer" within the meaning of the VPPA. However, for the reasons explained above, the Court rejects the *Yershov* court's reasoning.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.